Victor GLASSEY, Plaintiff-Appellant,†

v.

CONTINENTAL INSURANCE COMPANY, The DeVilbiss Company and Champion Spark Plug Company, Defendants-Respondents.

Supreme Court

*No. 91–2490. Oral argument February 2, 1993.—Decided June 3, 1993.*

(Also reported in 500 N.W.2d 295.)

†Motion for reconsideration filed June 25, 1993.

587

589

590

For the plaintiff-appellant there were briefs (in the court of appeals) by *Robert G. Dowling* and *Shneidman, Myers, Dowling & Blumenfield*, Milwaukee and oral argument by *Robert G. Dowling*.

For the defendants-respondents there was brief (in the court of appeals) by *Donald M. Lieb* and *Otjen, Van Ert, Stangle, Lieb & Weir, S.C.* and oral argument by *Donald M. Lieb*.

JON P. WILCOX, J. This case comes to the court on certification from the court of appeals pursuant to sec. (Rule) 809.61, Stats. The plaintiff-appellant, Victor Glassey, appeals from a judgment of the circuit court dismissing, on its merits, his strict products liability claim against the defendant-respondent, The DeVilbiss

Company. We conclude, as did the circuit court, that a strict products liability action cannot be maintained against a manufacturer when the product has undergone substantial and material changes after leaving the control of the manufacturer. We affirm.

The court of appeals certified the following issue to this court:

> Whether a user's substantial change to a product precludes a strict products liability case from going to the jury as a matter of law?

Glassey raises two additional issues which we will address:

(1) Whether the trial court properly exercised its discretion in allowing DeVilbiss to introduce evidence that there were no other similar claims reported to DeVilbiss regarding this product?

(2) Whether the trial court properly exercised its discretion in excluding certain testimony of the plaintiff's engineering expert witnesses?

We will not address issues raised by Glassey regarding a new trial because we affirm the circuit court and no new trial will be granted in this case.

Glassey was seriously injured while at work when a screw-on cap blew off a pressurized spray tank and struck him in the forehead. Glassey initiated a lawsuit asserting causes of action in strict products liability and negligence against DeVilbiss, the manufacturer of the spray tank.[1] Following the close of Glassey's evi-

---

[1] DeVilbiss is a division of Champion Spark Plug Company which was also named as a defendant, along with DeVilbiss' insurer, Continental Insurance Company. The subcontractor

dence at the jury trial, the trial court granted DeVilbiss' motion to dismiss the strict products liability claim. The trial court held that substantial changes to the tank barred a strict products liability claim as a matter of law. The trial proceeded on the negligence claim. The jury returned a verdict finding no negligence on the part of DeVilbiss, Buckeye Boiler, or Glassey. The jury found Glassey's employer, Wisconsin Centrifugal, solely at fault for the accident. The jury assessed Glassey's damages at $919,656.72. Glassey appealed and we accepted certification from the court of appeals.

The DeVilbiss spray tank involved in this case was used by Wisconsin Centrifugal to apply coatings of a water-based "wash" solution onto dies before molten metal was poured into the dies. The spray tank operates by having compressed air come into the tank from shop air lines, thereby allowing the solution to be sprayed out of a tube under pressure.

The spray tank was a thirty gallon tank made up of two separate parts. The lower section is the cylinder body of the tank which holds the solution. The top section consists of a large lid with attachments. The lid is approximately two feet in diameter and weighs seventy-five pounds. The lid is attached to the body by ten clamps around its circumference. The lid contains a 4–inch wide filler neck which allows the tank to be filled without removing the entire lid. The end of the filler neck that protrudes above the tank lid is threaded on its outer surface. The filler neck is sealed by using a filler cap with internal threads. The tank body, lid, and

and supplier, Buckeye Boiler, was initially named in the suit but was dismissed prior to trial on a *Pierringer* release. Glassey also brought a worker's compensation action against his employer, Wisconsin Centrifugal Foundry.

filler neck are made of carbon steel. The filler cap is made out of gray cast iron. A number of parts of the tank that are immersed in the solution to be sprayed are made out of stainless steel.

The history of the spray tank involved in this accident is not well known. The spray tank was obtained by Wisconsin Centrifugal sometime prior to the accident which occurred on August 16, 1983. The spray tank was ten years old at the time of the accident. Wisconsin Centrifugal never contacted DeVilbiss or any of its agents concerning use, service or repair of the spray tank prior to the accident.

The spray tank was mounted on a cart which moved along a track next to the casting machine. At the time of the accident, Glassey was standing on the cart. He was having difficulty operating the spray tank because air was leaking from the lid. Prior to the accident workers saw Glassey tapping on the clamps with a small hammer in an attempt to better secure the lid. A few moments later Glassey was struck in the forehead by the filler cap which blew off the filler neck.

At the time of the accident, the spray tank was badly worn and deteriorated. A number of changes were made to the spray tank from the condition it was in when it left DeVilbiss. The most important and material change is that the original DeVilbiss filler cap was replaced with a "plumbers cap." A plumbers cap is normally used to seal off abandoned gas pipes. There are a number of substantial differences between the original DeVilbiss cap and the replacement cap. The original DeVilbiss cap and filler neck had straight threads designed for repetitive opening and closing. The DeVilbiss cap could be turned onto the filler neck by hand about 4 to 5 revolutions. The replacement cap had tapered threads, meaning the cap narrowed

towards its top. The replacement cap could only be turned 1 to 1½ turns onto the filler neck. The original DeVilbiss cap had a rubber gasket underneath the top of the cap. The gasket allowed the DeVilbiss cap to seal with the neck by the top edge of the filler neck pressing against the gasket when the cap was fully screwed onto the filler neck. The original DeVilbiss cap also contained four vent holes. When the cap is unscrewed, while there is pressure in the spray tank, air will pass through these vent holes alerting the user to the presence of pressure in the tank. The replacement cap contained a home-made gasket which did not seal with the filler neck because the cap could not be screwed on far enough. The replacement cap was designed to make a thread-to-thread seal with its tapered threads. The replacement cap did not have vent holes. The threads on the replacement cap and filler neck were badly corroded and worn at the time of the accident.[2]

Glassey argues that his strict products liability claim should not have been dismissed because the changes to the spray tank, including the use of the replacement cap, were not substantial factors in caus-

---

[2] The defendant produced evidence of other changes and inoperable parts which we need not consider because we conclude the replacement of the filler cap alone was a substantial and material change requiring dismissal of the strict products liability action against DeVilbiss. The other changes included: three of the ten clamps that hold the lid onto the tank were missing; an air regulator designed to regulate the air pressure going into the tank had been removed from the tank and located on the cart; a pressure gauge that measured air pressure in the tank was removed from the tank and positioned on the cart; the manual agitator that stirred the solution in the tank was replaced with a motorized agitator; the petcock valve was inoperable; the safety release valve was replaced; and stainless steel paddles on the pick up tube were replaced.

ing his injuries. Glassey's experts testified that the spray tank was defective and unreasonably dangerous as designed by DeVilbiss. Glassey criticized the tank design for three reasons: (1) the use of carbon steel for the filler neck assembly rather than stainless steel, despite the fact that stainless steel is much more resistent to corrosion than carbon steel; (2) the use of a filler neck that is welded in place on the tank lid which encourages use of a filler neck with worn threads because the only way to replace the filler neck is to buy a completely new lid; and (3) the use of a threaded coupling for the filler neck and cap as opposed to a non-threaded opening and chain which would attach the cap to the lid thereby preventing loss of the cap as well as preventing the cap from exploding off the tank in an uncontrolled fashion. Glassey contends that a strict products liability action should not be dismissed merely because changes have occurred to the product, unless the changes were the sole cause of the accident and were not foreseeable by the manufacturer.

DeVilbiss responds that the spray tank involved in this case was badly deteriorated and abused. DeVilbiss contends that a manufacturer should not be subject to a strict products liability action when the user permits the product to fail by deterioration and abuse. DeVilbiss asserts that courts should dismiss strict products liability claims when there is any substantial change to the product after the product leaves the manufacturers control.

### I.

The first issue is whether a user's substantial change to a product precludes a strict products liability case from going to the jury as a matter of law. This court first adopted the rule of strict products liability,

597

as set forth in Restatement (Second) of Torts sec. 402A (1965), in *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967). That section provides:

Section 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) *it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.*

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller. (Emphasis added).

The rule of strict products liability offers the plaintiff a theory of recovery for damages resulting from defective and unreasonably dangerous products independent of negligence and implied warranty law. The most beneficial aspect of the rule is that it relieves the plaintiff of the difficult task of proving specific acts of negligence and insulates the plaintiff from the implied warranty defenses of notice of breach, disclaimer, and lack of privity. *Dippel,* 37 Wis. 2d at 460.

Strict liability does not make the manufacturer or seller an insurer nor does it impose absolute liability. *Id.,* 37 Wis. 2d at 459–60. Rather, in order to recover on a strict products liability claim, the plaintiff must prove each of the following elements:

> (1) that the product was in a defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer *without substantial change* in the condition it was when he sold it. (Emphasis added).

*Id.,* 37 Wis. 2d at 460. Once the plaintiff has met its burden of proof, the manufacturer or seller is deemed negligent *per se* and may avail himself or herself of the defenses of contributory negligence. *Id.*

In the instant case, the trial court found that the plaintiff had met its burden of proof with regard to elements one through four set forth above. This case focuses on the fifth element or the substantial change element. The trial court ruled that the spray tank in question had undergone substantial changes from the time it left DeVilbiss, such that as a matter of law DeVilbiss could not be held strictly liable for Glassey's damages. No previous Wisconsin decision has addressed what constitutes a "substantial change" and the circumstances under which a change may relieve a manufacturer or seller from strict products liability.

After reviewing the evidence in light of the products liability law of Wisconsin, we agree with the trial court that Glassey's strict products liability claim must be dismissed as a matter of law.

We conclude that in order to maintain a strict products liability claim the plaintiff must show that the product has not undergone a substantial and material change from the time it left the manufacturer or seller. When the condition of a product at the time of an accident is substantially and materially different from its condition at the time it left the control of the manufacturer or seller, the plaintiff will be unable to prove its *prima facie* case and the strict products liability claim must be dismissed. *Berry v. Gibson,* 491 N.E.2d 33, 35 (Ill. App. Ct. 1986); 3 American Law of Products Liability 3d sec. 43:1 (1987). A substantial and material change is a change in the design, function or character of the product linked to the accident. In this case there was a substantial and material change in the design and character of the spray tank linked to the accident because the DeVilbiss filler cap was replaced with a non-standard cap. This change was material to the accident because it was the replacement cap that blew off the spray tank striking Glassey in the head.

Unlike negligent tort-feasors whose liability is based on his or her failure to act, liability of strict products liability tortfeasors arise not from their conduct, but from the nature or condition of the product. Manufacturers or sellers cannot be held strictly liable if the condition of the product substantially changes in a way that is material to the accident after the product leaves their control.

600

This rule is consistent with prior strict products liability decisions of this court. In *Dippel,* we stated that "abuse or alteration of the product may relieve or limit liability . . . ." *Dippel,* 37 Wis. 2d at 460. In *City of Franklin v. Badger Ford Truck Sales, Inc.,* 58 Wis. 2d 641, 649, 207 N.W.2d 866 (1973), this court held that where a defective component part is incorporated into something larger, causing injury, the maker and supplier of the defective component part is subject to strict products liability. However, the court stated: "Where the component part is subject to further processing or substantial change, or where the causing of injury is not directly attributable to defective construction of the component part, the result might be different." *Id.* Our rule in the instant case makes clear that a substantial and material change in a product, occurring after the product leaves the control of the manufacturer or seller, relieves the manufacturer or seller of strict products liability.

One argument against relieving manufacturers and sellers of strict liability when substantial changes are made to their products is that the largest percentage of changes to products are made by employers, against whom workers compensation may be the injured party's exclusive remedy. However, "the absence of a tort remedy against the employer should not of itself give rise to a third-party remedy against a manufacturer or distributor who merely furnished the product to the employer." 3 American Law of Products Liability 3d, sec. 43:1 (1987); *Robinson v. Reed-Prentice Division of Package Machinery Co.,* 403 N.E.2d 440, 444 (N.Y. 1980).

Furthermore, when a plaintiff is unable to prove the elements necessary to recover under a strict liability theory, the manufacturer or seller may still be liable under a negligence theory where the plaintiff is able to prove specific negligent conduct. *Vincer v. Esther Williams All-Aluminum Swimming Pool Co.,* 69 Wis. 2d 326, 330, 230 N.W.2d 794 (1975). Strict liability and negligence are alternative theories of recovery in Wisconsin products liability cases. In this case, although the strict products liability claim was dismissed, Glassey was permitted to bring a negligence claim. The fact that the jury found no fault against DeVilbiss points out the inequity that would have resulted had Glassey been able to pursue a strict products liability claim in which DeVilbiss would have been required to pay 100 percent of Glassey's damages which it did not cause.

This court in *Dippel* summarized the public policy considerations that underlie the rule of strict products liability:

> The reason, which has been reiterated most often, is that the seller is in the paramount position to distribute the costs of the risks created by the defective product he is selling. He may pass the cost on to the consumer via increased prices. He may protect himself either by purchasing insurance or by a form of self-insurance. In justification of making the seller pay for the risk, it is argued that the consumer or user has the right to rely on the apparent safety of the product and that it is the seller in the first instance who creates the risk by placing the defective product on the market. A correlative consideration, where the manufacturer is concerned, is that the manufacturer has the greatest ability to control the risk created by his product

since he may initiate or adopt inspection and quality control measures thereby preventing defective products from reaching the consumer.

*Dippel,* 37 Wis. 2d at 450–51.

These policies are not promoted by imposing the strict liability rule when a substantial and material change is made to a product after it leaves the control of the manufacturer or seller. Imposition of strict liability on the manufacturer or seller would not achieve any significant reduction of risk when the product is substantially changed by a third party. The manufacturer or seller has no control over alterations made to its product by third persons and therefore is in no position to pass on the costs of risks associated with these changes to consumers through increased prices. Even if the manufacturer or seller can anticipate the cost of increased risk due to unknown changes to its product, it is not fair to require other consumers to pay these costs in the form of higher prices because some consumers decide to make changes to the product. The party in the best position to pay for the cost of changes to products is the party who makes the changes. The manufacturer or seller is not the one who creates the risk when alterations are made to a product by third parties. Inspection and quality control measures will not prevent changes made to the product after it leaves the manufacturer or sellers control. In situations where the product has undergone a substantial change by a third party, the policy of compensating persons injured by dangerous products is more equitably served by common law negligence rules.

In the instant case, Glassey's employer, Wisconsin Centrifugal, made the changes to the spray tank. The jury found Wisconsin Centrifugal solely at fault for

Glassey's injuries. The fact that Glassey cannot maintain a tort action against Wisconsin Centrifugal because workers compensation is his exclusive remedy against his employer is a policy decision made by our legislature. If this policy is inequitable or unjust, it is for the legislature to correct.

Glassey urges that the rule to be applied in Wisconsin should be that "a subsequent change in a product will not relieve a manufacturer from strict liability unless the subsequent alteration itself created the defect that constituted the sole cause of injury, and the change was not reasonably foreseeable by the manufacturer." Glassey cites *Soler v. Castmaster, Division of H.P.M. Corp.*, 484 A.2d 1225 (N.J. 1984), in support of this rule.

We reject this rule because it does not promote the policies that underlie the imposition of strict products liability on a manufacturer or seller. Further, a plaintiff will generally be able to find an expert witness, as Glassey did in this case, who will testify that the change was not the sole cause of the injury. There is nothing in sec. 402A of the Restatement or prior Wisconsin case law that indicates that an alteration or change must be the sole cause of an injury in order for the manufacturer to be relieved of strict products liability. Foreseeability is not an element considered in strict products liability claims, but instead is an element of negligence. When a substantial change that is material to an accident has occurred to a product after the product has left the control of the manufacturer, we believe public policy and equity is best served by common law negligence rules.

604

In the instant case, Glassey's expert witness testified that the use of a standard DeVilbiss cap instead of the replacement cap would not have prevented the corrosion which caused the accident. We hold that the trial court properly dismissed the strict products liability claim as a matter of law and we agree with the following conclusion of the trial court:

> The machine is not in the same condition by any stretch of the imagination as it was when it left the manufacturer's hand, and I'm not talking about corrosion or wear or tear. I'm talking about changes man made to this machine.
>
> The cap . . . which caused the accident, the fact that it is a different cap alone is sufficient to take this out of strict liability.

The use of a non-standard replacement cap was a substantial and material product change requiring Glassey's strict products liability claim be dismissed as a matter of law. It was the replacement cap which blew off the spray tank and caused Glassey's injuries. Imposition of strict products liability in this case would not serve any of the public policies underlying that rule. Public policy was best served by allowing Glassey to pursue his negligence claim and permitting the jury to assess the fault amongst the parties.

In this case it is clear that as a matter of law the trial judge could dismiss the strict products liability claim because a substantial and material change occurred to the product. In some cases, whether a change is substantial and material to the accident may be a question for the jury.

605

## II.

The second issue concerns whether the trial court properly exercised its discretion in permitting DeVilbiss to introduce evidence as to the absence of other claims involving DeVilbiss spray tanks. In particular, DeVilbiss was allowed to introduce testimony through its former Products Safety Administrator, Gary Bell, that DeVilbiss had no record of any accidents or claims involving its spray tanks similar to the Glassey accident. Glassey argues that evidence of other similar claims should have been excluded based on lack of foundation because DeVilbiss did not show that its records were likely to reflect whether any accidents had actually occurred.

Evidence that there were no similar accidents or claims involving a product is "negative evidence" and is admissible. *D.L. v. Huebner,* 110 Wis. 2d 581, 622, 329 N.W.2d 890 (1983). "To be admissible, however, the witness must be in a position to testify on the basis of personal knowledge or experience that the event did not occur." *Id.* The event in this case is the reporting to DeVilbiss of other accidents or claims involving its spray tanks.

DeVilbiss established an adequate foundation that Bell was in a position to know if any other accidents or claims involving its spray tanks were reported to DeVilbiss. Bell was the Product Safety Administrator at DeVilbiss and had been with the company since December of 1979. Bell testified that after he learned of the Glassey accident, he performed an investigation to determine if any other similar accidents were ever reported to the company. He reviewed the files of the Customer Service Group and the Product Complaint Notice forms they maintained. He reviewed the record

system where all DeVilbiss employees and distributors are trained to fill out accident report forms if they hear about an accident involving a DeVilbiss product. He reviewed all the litigation files of DeVilbiss. He interviewed engineers, sales people and field staff to determine if they had ever heard of a similar accident. Bell was in a position to know if other accidents had ever been reported to DeVilbiss.

We conclude that the trial court properly exercised its discretion in admitting the other claims evidence.

## III.

The final issue is whether the trial court properly exercised its discretion in excluding certain opinion testimony from Glassey's liability expert witnesses. At trial Glassey called two liability expert witnesses. Robert Schoof holds a masters of science degree in engineering and is a registered professional engineer. Schoof has experience in designing pressure vessels and in dealing with the codes which apply to such vessels. Larry Burck holds a master of science degree in engineering mechanics and a Ph.D. in materials science and engineering. Burck has extensive experience in the areas of metallurgy and failure analysis. Glassey contends that the trial court improperly excluded significant opinion testimony from these experts in that: (1) Schoof was prevented from expressing his opinion as to whether the use of a standard DeVilbiss cap for the same period of time as the replacement cap would have produced the same injury; (2) Schoof and Burck were prevented from expressing opinions as to whether Glassey's injuries would have occurred if the filler neck was made out of stainless steel; (3) Schoof was not allowed to express an opinion as to whether the tank

lid was defectively designed because the filler neck was made out of carbon steel.

Evidentiary rules regarding expert witness testimony are set forth in Chapter 907 of the Wisconsin Statutes. Section 907.02, Stats., provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Section 907.04, Stats., provides:

> Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

The determination that a witness is qualified to testify as an expert and that his or her opinion should be admitted into evidence rests within the sound discretion of the trial court. On review, the appellate court will not reverse absent an erroneous exercise of discretion. *Farrell v. John Deere Co.,* 151 Wis. 2d 45, 70, 443 N.W.2d 50 (Ct. App. 1989). We review a discretionary decision only to determine whether the trial court examined the facts of record, applied a proper legal standard and, using a rational process, reached a reasonable conclusion. *Id.* 151 Wis. 2d at 70. Our review of the record satisfies us that the trial court properly exercised its discretion in excluding the above challenged testimony of Glassey's expert witnesses.

The trial court did not prevent Glassey's experts from testifying about the properties of stainless steel

versus carbon steel and about their corrosive nature. Burck was allowed to testify that stainless steel would not have corroded over the ten year period the spray tank was in use. However, given all the variable factors that went into creating the accident and injury Glassey suffered, the trial court reasonably concluded that it would be pure speculation for an expert to express an opinion as to whether the accident would have happened had just one variable been changed; i.e. a standard DeVilbiss cap used instead of the replacement cap or a stainless steel filler neck instead of carbon steel.

Any error the trial court might have made in preventing Schoof from giving his opinion that the spray tank lid was defectively designed because the filler neck was made out of stainless steel was harmless error. Schoof was permitted to testify that the filler neck design was deficient because it was made out of carbon steel rather than corrosion resistant stainless steel. Schoof was permitted to testify that the use of carbon steel instead of stainless steel for the filler neck made the spray tank unreasonably dangerous to users. Further, Burck was permitted to testify that it was his opinion that DeVilbiss negligently designed the spray tank by using carbon steel instead of stainless steel for the filler neck and this negligent design caused Glassey's injuries.

We conclude that the trial court properly exercised its discretion in excluding certain opinion testimony of Glassey's experts.

*By the Court.*—The judgment of the circuit court is affirmed.