Julie KLONOWSKI, now Arndt, and Threshermen's Mutual Insurance Company, Plaintiffs–Appellees,

v.

INTERNATIONAL ARMAMENT CORPORATION, Defendant–Appellant.

No. 93–1554.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1993.

Decided Feb. 24, 1994.

Bradford E. Hunt, Alton, IL, Randall Skiles (argued), Stern, Skiles & Ward, Madison, WI, for plaintiffs-appellees.

Bradley D. Armstrong, Steven M. Streck, Axley Brynelson, Madison, WI, Timothy G. Atwood (argued), Trumbull, CT, for defendant-appellant.

Before COFFEY and ROVNER, Circuit Judges, and WILL, District Judge.*

COFFEY, Circuit Judge.

Julie Klonowski (now Julie Arndt), a Wisconsin resident injured in a hunting accident when her husband's shotgun misfired, brought this products liability action in diversity against International Armament Corporation ("IAC"), a Delaware corporation which imported and distributed the shotgun involved in the accident. After determining IAC's liability to be 80%, a jury awarded Mrs. Arndt $169,365 for her injuries, and also awarded the co-plaintiff, Threshermen's Mutual Insurance Company, $101,000 for payments made to Mrs. Arndt on behalf of its insured, Lawrence Arndt. IAC appeals the judgment. We affirm.

## I. FACTS

Mrs. Arndt was injured on September 28, 1990, while grouse hunting with her then-fiance, Lawrence Arndt, in Price County, Wisconsin. As they were walking down a snowmobile trail in dense woods, Mr. Arndt heard birds flush nearby. Mrs. Arndt remained on the trail and her husband entered the woods in pursuit of the birds, but after walking approximately sixty feet, he heard the birds flush deeper into the forest. Mr. Arndt decided to return to the trail but as he did so he tripped and fell to the ground. As he fell, he put his left hand out to break the fall, leaving the shotgun in his right hand. The gun struck the ground, and although the safety was locked into position, the right barrel of his shotgun fired. Pellets from the shell struck Mrs. Arndt causing permanent injury to her right eye.

Mr. Arndt's gun was a Rossi Squire ("Rossi")[1], a twelve-gauge, box-lock, side-by-side double barreled shotgun that he purchased in August of 1988 from Bill's House of Guns in Merrill, Wisconsin.[2] The gun has two triggers; the front trigger fires the right barrel and the back trigger activates the left barrel.

---

* The Honorable Hubert L. Will, District Judge for the Northern District of Illinois, is sitting by designation.

1. Rossi manufactures at least two models of shotguns: the Rossi Squire and the Rossi Overland.

The Overland is not involved in this action, thus we refer to the Rossi Squire as the "Rossi."

2. Bill's House of Guns had received the shotgun from IAC which had purchased the gun from Rossi in 1986.

Each trigger is attached to a trigger blade, which rises when the trigger is squeezed. When the trigger blade is raised high enough, it contacts a sear, which releases the spring-loaded hammer, the hammer falls and strikes the firing pin, activating the gun's firing mechanism. The shotgun contains a safety mechanism that prevents the gun from accidentally firing by inserting a trigger pivot pin through the trigger blades. To disengage the safety, the button must be pushed forward to the "fire" position.

Between the time Mr. Arndt purchased the shotgun in August of 1988 and the date of the accident on September 28, 1990, Mr. Arndt estimated that he had fired the gun a total of sixty to sixty-five times. He had never loaned the gun to anyone and to the best of his knowledge no one else had fired it.

Investigation after the accident revealed that the gun discharged because its trigger mechanism was defective. Nicholas Makinson, an expert in the manufacture and repair of double barreled firearms, examined and performed tests on Mr. Arndt's Rossi shotgun and determined that the gun would discharge 65% of the time with the safety mechanism locked into position when dropped onto a carpeted floor from a height of twenty-one inches. Makinson testified that the trigger pivot pin was bent which allowed the trigger blades to come into contact with the sear which in turn released the spring-loaded hammer with the safety engaged. Makinson concluded that the shotgun, as manufactured, was defective and unreasonably dangerous, in part, because the pin was made from an insufficiently hard piece of steel. He explained that rather than using a hard screw, Rossi used a soft rivet that bent when force was applied to the triggers with the safety on. Makinson also noted that because Mr. Arndt's Rossi Squire did not utilize outside support arms the trigger blades were able to wobble out of arc, thus making it possible for the trigger blades to come in contact with the sear causing the gun to fire even though the safety mechanism was engaged. Despite the fact that a 1982 safety booklet, introduced in evidence, contained an illustration of the Rossi trigger mechanism in which outside sup-

port arms were present, Mr. Arndt's shotgun was not manufactured with the outside support arms. Makinson concluded that the lack of outside support arms combined with the soft rivet used in the trigger pivot pin were both design defects which in his opinion caused Mr. Arndt's shotgun to fire when it struck the ground on September 28, 1990 while the safety mechanism was locked into position. Makinson also testified that the trigger mechanism he described (with a hard screw for a trigger pin and side supports) was "generally used right throughout the industry" and that "everybody else in the world[ ]" uses it but Rossi failed to incorporate those features and as a result the gun was not only defective but was also unreasonably dangerous. Finally, he testified that the gun manufacturers know that guns are dropped and damaged by users, for instance in the case of a hunter falling, but that they must be designed so that the gun does not discharge when the safety is engaged.

On cross-examination, Makinson stated that given the Rossi's defective design (soft trigger pin and lack of outside support arms), he expected that there might have been repeated occurrences of the gun firing when the safety was on. During its case-in-chief, the defense called Michael Parker, Vice President and general counsel for IAC (not a firearms expert), who testified that he was responsible for the handling of injury claims resulting from guns IAC sold. Defense counsel sought to elicit from Parker the actual number of Rossi shotguns his company had sold during his tenure, but counsel for Mrs. Arndt objected "as to relevancy." The district court sustained the objection. Although the court refused to permit Parker to testify as to the number of Rossis IAC sold, the court did allow Parker to testify that during his tenure he had never received a report of malfunction or accidental injury relating to the Rossi.

During Parker's cross-examination, Mrs. Arndt's counsel asked Parker how many guns IAC sold per year. Parker responded that IAC sold approximately 150,000 per year, and that the "vast preponderance of them are imported" for sale in the United States. At the conclusion of Parker's testi-

mony, defense counsel sought to make an offer of proof that IAC had distributed some 50,000 Rossis throughout the country since 1980. In the following exchange, the court ruled that because Arndt's counsel had "opened the door," Parker could have testified as to the number of Rossis sold without report of accidents:

> The Court: Well, as a result of [plaintiff's counsel's] question on cross-examination, you were perfectly free to do that on redirect. He asked the number.
>
> [Counsel for IAC]: He asked how many guns in general were sold.
>
> The Court: That's right.
>
> [Counsel for Mrs. Arndt]: No, not Rossi Squires. Just how many they imported.
>
> The Court: I understand that. That would have allowed you to get that in, no question about it. He opened it for you, and I put down "oh-oh." So it would have gone. I would have overruled any objection relating thereto, and this happens in trial. I figured that's what you were talking about. This happens in every trial I've ever been in. I'll sustain the objection, and the next thing I know the person who made it will get up and ask a very similar question.

At the conclusion of trial, the judge drafted a special jury verdict form. The relevant questions and instructions from the special verdict form are given *infra* in section II.B. The jury found that the shotgun in question was defectively designed and unreasonably dangerous when it left the manufacturer and determined IAC's liability to be 80%.

## II. *DISCUSSION*
### *Standard of Review*

■ As a federal court sitting in diversity, we apply Wisconsin state law to resolve the substantive questions concerning the accident and federal law on any procedural and evidentiary issues. *See Mercado v. Ahmed,* 974 F.2d 863, 866 (7th Cir.1992).[3] "The appellant carries a heavy burden in challenging a trial court's evidentiary rulings on appeal because a reviewing court gives special deference to the evidentiary rulings of the trial

court." *Ross v. Black & Decker, Inc.,* 977 F.2d 1178, 1183 (7th Cir.1992) (citing *Wheeler v. Sims,* 951 F.2d 796, 801–02 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 320, 121 L.Ed.2d 241 (1992)), *cert. denied,* —— U.S. ——, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993). "We will reverse such [evidentiary] rulings only upon a showing that the trial court committed an abuse of discretion." *Id.* Moreover,

> [u]nder the abuse of discretion standard of review, the relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place.... Rather, the abuse of discretion standard is met only when the trial judge's decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based that decision, or where the unsupported facts found are clearly erroneous.

*Id.* (citing *Wheeler,* 951 F.2d at 802). "Our review is limited under Fed.R.Civ.P. 61 to whether an 'error in either the admission or the exclusion of evidence was made which affected the substantial rights' of the defendant." *Id. See also* 28 U.S.C. § 2111 ("[o]n the hearing of any appeal ... in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties").

### A. *Number of Shotguns Sold Without Injury*

■ IAC mistakenly contends the district court abused its discretion by initially refusing to allow Michael Parker to testify that since 1980 IAC imported some 50,000 Rossis. As we explain below, we reject IAC's argument on two grounds: (1) because IAC failed to lay a proper foundation for the introduction of the evidence concerning the number of shotguns sold (he failed to establish that the design of the Rossi shotgun had remained the same during the period in question), and (2) because the trial court's ruling initially denying the admission of Parker's testimony as to the number of guns sold

---

**3.** Both parties agree that Wisconsin law governs the substantive issues in this case.

without accident did not affect substantial rights of the defendant.

In regard to the admission of evidence to demonstrate a lack of prior accidents, the Wisconsin courts have stated:

> The supreme court has characterized this kind of negative evidence in safe place cases as only "slightly probative." *Tiemann v. May*, 235 Wis. 100, 108, 292 N.W. 612, 616 (1940). Such evidence is generally held inadmissible because of its insignificant probative qualities and its tendency to introduce a multitude of collateral inquiries. *Id.* In light of the dubious value of such evidence, we see no abuse of discretion in the trial court's ruling excluding such evidence.

■ *Hannebaum v. Direnzo & Bomier*, 162 Wis.2d 488, 499, 469 N.W.2d 900 (Ct.App. 1991). Such evidence is only admissible when the party seeking to introduce the evidence establishes that the lack of accidents was in regard to products that are "substantially identical to the one at issue and used in settings and circumstances sufficiently similar to those surrounding the machine at the time of the accident to allow the jury to connect past experience with the accident sued upon." *Walker v. Trico Mfg. Co., Inc.*, 487 F.2d 595, 599 (7th Cir.1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). We reiterate that the rulings of the trial court on evidentiary matters such as this receive "special deference" on appeal. *Ross*, 977 F.2d at 1183.

In the case before us, IAC explained in an offer of proof that it sought to admit evidence that since 1980 it had imported some 50,000 Rossi shotguns and had never received a report of an accident. The defense, however, did not establish that all the Rossis IAC sold since 1980 incorporated trigger mechanisms that were "substantially identical" to the trigger mechanism found in Arndt's shotgun, thus, IAC, failed to lay a proper foundation for the admission of this evidence. Although Parker testified that the Rossi used the same trigger mechanism since 1982, there was no testimony that the trigger mechanism used before 1982 was substantially identical to that in the guns manufactured after 1982. In fact, the plaintiff submitted in evidence a diagram of the Rossi prepared by IAC in 1982 that contained a trigger design different from the one employed in the shotgun Arndt purchased in 1988. Thus the evidence in the record demonstrates that Rossi may have employed two different trigger designs during the time period in question (the one in the 1982 diagram *with* outside arm supports and the one Arndt purchased in 1988 *without* outside arm supports). Although there is no evidence of when Arndt's gun was manufactured, we do know Rossi sold the gun to IAC in 1986 and Arndt's gun has a different design than the Rossi shotgun in the 1982 diagram. Since IAC failed to lay a proper foundation that all the Rossi shotguns IAC sold since 1980 employed a trigger mechanism substantially identical to the one found in Arndt's shotgun, the trial court was well within its discretion in refusing to allow Parker to testify as to the number of Rossis sold without report of injury.

■ Secondly, IAC had, but did not utilize, the opportunity to introduce the 50,000 figure when counsel for Mrs. Arndt "opened the door" for the reception of evidence of this nature by asking Parker on cross-examination how many guns IAC sold per year. As the judge stated, after the question from plaintiff's counsel, the court would have overruled any subsequent objection relating to the number of Rossis sold without report of accident. Surprisingly, IAC never raised the issue during its re-direct examination of Parker even though it would have been permissible.

Additionally, IAC, in its attempt to discredit Makinson's testimony, was able to inform the jury that it had never received any reports of the Rossi shotgun accidentally misfiring due to a defective design. Moreover, Parker also testified that IAC imported approximately 150,000 guns annually from Brazil, Germany and Spain, and that it had been importing Rossis from Brazil since 1978. We hold that the trial court did not abuse its discretion by initially refusing (on relevancy grounds) to allow Parker to testify as to the number of Rossis IAC had sold without incident because the defendant failed to lay a proper foundation for the reception of the evidence. Regardless of the propriety

of the judge's ruling, we are of the opinion that the trial court's decision did not affect the substantial rights of the defendant because the jury ultimately heard evidence later in the trial not only of the number of guns IAC sold annually but also that this was the only report of an accidental discharge.

### B. *Jury Instruction*

At trial, IAC's theory of defense was that the Rossi shotgun was safe when it left IAC's control but subsequently became unsafe after someone bent the trigger pivot pin by applying excessive force to the trigger while the safety was in the locked position. Makinson, the plaintiff's gun expert, agreed that the trigger pivot pin was likely bent "because there was excessive pressure put onto the trigger whilst the gun was on safe." However, Makinson testified the design was defective because there were no outside arm supports and because it employed a trigger pivot pin made of soft metal rather than a hardened screw and thus would bend under pressure. Makinson also testified that it was foreseeable that extreme pressure would sometimes be used on the trigger while the safety was engaged.

■ The court gave the jury a special verdict form. Question number one read as follows:

1. Was the Rossi shotgun when it left the possession of the Defendant, International Armament Corporation, in such defective condition as to be unreasonably dangerous to a prospective member of the public? Answer yes or no. If you answered Question 1 yes, answer Question 2. Otherwise, proceed no further.

Question number two read:

2. Did the Rossi shotgun reach Lawrence Arndt without substantial change in its original condition? Answer yes or no. If you answered Question 2 yes, answer Question 3. Otherwise, proceed no further.

The court further instructed the jury:

A seller is not under a duty to sell a product which is accident or foolproof or which is absolutely free from all possible harm to every individual. It is the duty of the seller not to place upon the market a defective product which is unreasonably dangerous to the user or another person. Before you can answer the first question yes, that the Rossi shotgun was defective so as to be unreasonably dangerous, you must be satisfied by the greater weight of credible evidence to a reasonable certainty that: 1., the product was in a defective condition; 2., the defective condition made the product unreasonably dangerous to persons and property; and 3., the defective condition of the product existed when the product was under the control of the seller. Before you can answer Question 2 yes, you must find that the Defendant expected the Rossi shotgun to reach the ultimate user without substantial change in the condition it was sold and that the Rossi shotgun did reach Lawrence Arndt in such a condition.

IAC objected to the court's special verdict questions, contending that the questions and instructions limited the jury's consideration to any change in the condition of the product which arose between the time of IAC shipped the gun and the time Mr. Arndt gained possession and control of it. Thus, IAC contends the court precluded the jury from considering whether there had been any change in the shotgun's condition *after* Mr. Arndt purchased it.

■ We disagree with IAC's argument that the special verdict precluded the jury from considering its substantial change theory of defense because, as we explain below, the jury's finding that the gun was defective and unreasonably dangerous at the time it left the manufacturer's control, long before it ended up in the hands of the purchaser, foreclosed the substantial change defense. As long as the instructions taken as a whole adequately convey to the jury the necessary information, a new trial is not required. *Sumnicht v. Toyota Motor Sales*, 121 Wis.2d 338, 360 N.W.2d 2 (1984).[4]

---

**4.** In *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967), the Wisconsin Supreme Court adopted § 402A of the Restatement (Second) of Torts.

The court held that to prevail in a strict products liability claim the plaintiff must prove:

When asked whether the shotgun was defective and unreasonably dangerous at the time it left IAC's possession, the jury answered "yes." The jury was specifically instructed that before it could answer the first question yes, it had to find "the defective condition of the product existed when the product was under the control of the seller." The jury confirmed its finding that the gun was defective and unreasonably dangerous when it left the hands of the manufacturer by affirmatively answering question number two which asked: did the Rossi shotgun reach Lawrence Arndt without substantial change from its original condition? Based on the totality of the record including these two findings by the jury, we reject IAC's argument that the special verdict form precluded the jury from considering whether Mr. Arndt or someone else caused the product to become unsafe after it left IAC's control. Given Makinson's testimony that the shotgun was defective because it incorporated a trigger pivot pin made of a soft rivet rather than a hardened screw, and that there were no outside support arms to secure the trigger blades and trigger pivot pin, the jury's conclusion that the product was defective when it left IAC's control was supported by the evidence.

■ Although a user's substantial alteration of the product may serve to reduce or negate a manufacturer's liability, *Glassey v. Continental Ins. Co.*, 176 Wis.2d 587, 500 N.W.2d 295, 301 (1993), in this case the alleged alteration by Mr. Arndt (bending the trigger pivot pin by applying excessive force) was only made possible because the product was defectively designed and unreasonably dangerous when the gun left the manufacturer's control. The defendant is apparently trying to expand the "substantial alteration" exception to strict product liability by arguing that a manufacturer who produces a defective and unreasonably dangerous product can be excused from all or a portion of its

liability when a consumer alters a product through normal usage, i.e., simply squeezing the trigger. In this case, any alteration that occurred from Mr. Arndt's use of the shotgun was foreseeable (manufacturer should foresee that user may put pressure on the trigger when the safety is on). Moreover, there was no evidence that Mr. Arndt employed some extraordinary means of force or device like a tool or an instrument to alter (bend) the mechanism, thus the defendant's claim that the jury instruction was improper is without merit.

### III. CONCLUSION

The trial court did not abuse its discretion by initially sustaining the plaintiff's objection concerning the number of Rossi Squire shotguns IAC had sold nor did the court err by giving the special verdict questions in the form it gave them with the accompanying instructions.

AFFIRMED.

---

(1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it. *Id.* at 460, 155 N.W.2d 55. The instructions given to the jury in the case before us accurately reflect the Restatement and *Dippel.*