David E. SOLAR, and Donna K. Solar, husband and wife, individually, and as Co-special administrators of the Special Administration of Johnathon D. Solar, Plaintiffs,

v.

KAWASAKI MOTOR CORPS, U.S.A., Defendant.

No. 99–C–442.

United States District Court, E.D. Wisconsin.

Sept. 11, 2002.

Kathryn A Keppel, Gimbel Reilly Guerin & Brown, Milwaukee, for David E Solar, individually and as administrator of the Special Administration of Johnathon D. Solar, Donna K Solar, individually and as administrator of the special Administration of Johnathon D. Solar, plaintiffs.

Frank J Daily, Daniel J La Fave, Linda K Menzel, Janice L Tucker, Quarles & Brady, Milwaukee, Carl J Pesce, Richard A Mueller, Thompson Coburn LLP, St Louis, MO, for Kawasaki Motors Corp USA, defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE PRODUCTS LIABILITY CLAIM, AND DISMISSING CASE

CLEVERT, District Judge.

This court, having previously denied defendant's motion to strike affidavits filed in opposition to the summary judgment motion and having granted defendant's motion for summary judgment on the negligence claim, now turns to the issue of whether defendant is entitled to summary judgment on plaintiffs' remaining claim, products liability. For the reasons set forth below, defendant's motion for summary judgment will be granted and the case dismissed.

### FINDINGS OF FACT

This case arises out of a fatal incident on September 27, 1998, that occurred while

plaintiffs' son had the family's Jet Ski® on Lake Michigan. (Pl. Amended Complaint ¶¶ 6, 9). Kawasaki Motors Corp. (KMC) was the wholesaler and distributor for the subject Jet Ski®, which is a 1997 Kawasaki model JT 11001–Al STX, with hull identification number KAW57373D797. (Aff. La-Fave Ex. J [Defendant's Responses to Plaintiffs' Interrogatories, verified 6/19/00]; Pl. Amended Complaint ¶ 2). KMC did not design, manufacture or assemble the subject Jet Ski®, but, rather wholesaled the unit to an independent dealer in Wisconsin. (Aff. LaFave Ex. J [Defendant's Responses to Plaintiff's Interrogatories, verified 6/19/00] ). Plaintiff David Solar purchased the 1997 Jet Ski® on May 29, 1998. (Amended Complaint, ¶ 4).

On September 27, 1998, plaintiffs' son, Johnathon Solar, refueled the Jet Ski® at the Manitowoc Marina at approximately 3:00 p.m. He failed to return for dinner, and was reported missing around 6:30 p.m. (Pl. Amended Complaint ¶¶ 6, 7). Shortly after midnight, the Coast Guard recovered Johnathon's body still clad in his wet suit and life vest off the Wisconsin shore of Lake Michigan. (Pl. Amended Complaint ¶ 8). Three weeks later, the Jet Ski® washed up on the shore near Frankfort, Michigan. (Id., ¶ 9). No one witnessed the incident, and no one knows how Johnathon became separated from the Jet Ski®. (See generally Dep. DeBehke; Dep. Weiss).

When the Coast Guard recovered the Jet Ski® in Michigan, the lanyard was in place but the ball joint bolt that attaches the steering cable to the steering nozzle was detached. (Aff. La Fave Ex. I). The airhorn, which David Solar saw in one of the compartments two weekends earlier, was missing. David Solar believes no one else operated the Jet Ski® between his use on the weekend of September 12, 13, or 14, 1998, and Johnathon's use on September 27, 1998. (Aff. David Solar, ¶¶ 3–5).[1]

No experts or eyewitnesses can offer testimony as to when the ball joint bolt came out of its hole or how this occurred. Plaintiffs' experts cannot determine whether the steering cable became detached prior to or after the time of Johnathon Solar's death, as opposed to during the three weeks the Jet Ski® was in Lake Michigan before being recovered near Frankfort, Michigan. Even plaintiffs' metallurgist admits that he does not know when the steering bolt became detached.

Plaintiffs allege that the Jet Ski® would only go in circles with the steering cable detached, but did not test this theory or ride the model Jet Ski® in an attempt to support such a theory. KMC's riding expert, Rick Oxton, demonstrated that the Jet Ski® goes straight with the cable removed. (Aff.Oxton, ¶¶ 5–9, Ex. A). The demonstration revealed that some manual steering, using one's feet as rudders at times, is required for the Jet Ski® to travel in a straight line through waves and currents.[2] While riding with a friend on a

---

1. Defendant urges the court to disregard the affidavit of David Solar as it conflicts with prior deposition testimony that David used the Jet Ski® the weekend before Johnathon's death. However, viewing the evidence in a light favorable to the plaintiffs, it is possible to reconcile the testimony because David used the word "else" ("No one else operated the Jet Ski® between my use ... and my son's use.")

2. Plaintiffs point out that on the day of Oxton's test, the winds were coming from the northeast, which would direct the waves and therefore the Jet Ski® to shore, whereas on the day of Johnathon's death, winds were coming from the northwest, which would push the currents and therefore the Jet Ski® away from shore. KMC has stipulated that these statements are generally true.

prior occasion, Jonathan used his feet as rudders to help steer after hitting a sand-bar. (Aff. LaFave, ¶ 2, Ex. B [Dep. La-Fond, p. 32] ). His friend, Keith LaFond, testified that they didn't really know what was wrong. [The brass fitting from the ball bolt] "could have been off too at that time." (Aff. Brown, ¶ 8, Ex. 2 [Dep. La-Fond, p. 36] ).

Finally, it is undisputed that none of plaintiffs' experts expressed opinions re-garding causation, including: (1) the cause of Johnathon's death, (2) how he became separated from the Jet Ski ®, or (3) how the manufacture, design or warnings of the subject Jet Ski ® caused or contributed in any respect to Johnathon's death. (Dep. DeBenke, Exs. 2–3; Dep. Weiss, Ex. 2). Plaintiffs deny retaining experts for any such purpose.

## CONCLUSIONS OF LAW

Summary judgment is proper when "the pleadings, depositions, answers to inter-rogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Cha-vez v. Illinois State Police,* 251 F.3d 612, 635 (7th Cir.2001). To determine whether a genuine issue of material fact exists, the court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *See Chavez,* 251 F.3d at 635. However, only when a reasonable jury could find for the nonmoving party based on the record as a whole will there be a "genuine issue for trial." *See id.* Put another way, summary judgment should be entered when, after an adequate time for discovery, the nonmov-ing party fails to establish the existence of a genuine issue of material fact for trial or make a showing sufficient to prove an element essential to his case on which he will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Del Raso v. United States,* 244 F.3d 567, 570 (7th Cir.2001).

■ The amended complaint states two causes of action: products liability and negligence. Count One (products liability) alleges that the Jet Ski ® was "unreason-ably dangerous due to the in appropriate fastening device which caused the steering cable to become disconnected from the bucket housing" and that KMC failed to warn consumers of the alleged defect. (Pl. Amended Complaint, ¶ 18). Count Two (negligence) was dismissed earlier on the stipulation of the parties.

■ As Wisconsin law applies in this diversity action, *see Threshermen's Mutu-al Ins. Co. v. Wallingford Mutual Ins. Co.,* 26 F.3d 776, 780 (7th Cir.1994) (in diversity suit, federal court applies forum's law), KMC is liable under a theory of strict products liability if: (1) the Jet Ski ® was in defective condition when it left the pos-session or control of KMC; (2) it was unreasonably dangerous to the user or consumer; (3) the defect was a cause of Johnathon's death; (4) KMC engaged in the business of selling Jet Skis ® (it was not an isolated transaction unrelated to the principal business of the seller); and (5) the Jet Ski ® was one that KMC expected to, and did, reach the user or consumer without substantial change in the condition it was in when sold. *Tanner v. Shoupe,* 228 Wis.2d 357, 365–66, 596 N.W.2d 805, 811 (Ct.App.1999) (citing *Dippel v. Sciano,* 37 Wis.2d 443, 459–460, 155 N.W.2d 55, 63 (1967) (adopting Restatement (Second) of Torts § 402A)); (Wis JICivil 3200 (de-scribing all five elements of strict liability claim)). "The standard for causation in strict products liability cases is: 'whether the defect was a substantial factor in pro-ducing the injury.... It need not be the sole factor or the primary factor, only a substantial factor.'" *Tanner,* 228 Wis.2d at 368, 596 N.W.2d at 812 (quoting *Sum-*

*nicht v. Toyota Motor Sales U.S.A., Inc.,* 121 Wis.2d 338, 358, 360 N.W.2d 2, 11 (1984)).

■ The hurdle for plaintiffs on summary judgment is that they must cite to evidence of causation—that the alleged defect played a substantial role in the harm. "The phrase 'substantial factor' denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." *Merco Distributing Corp. v. Commercial Police Alarm Co.,* 84 Wis.2d 455, 458, 267 N.W.2d 652 (1978). This can be difficult in a case such as this where there are no witnesses to the accident, and plaintiffs must rely on circumstantial evidence.

■ Essential elements may be proved by circumstantial evidence; however, that evidence must have probative value to support a legal inference rather than speculation. It is never enough to present evidence that would require the jury to engage in speculation or conjecture. *Id.* at 460, 267 N.W.2d at 655. Speculation and conjecture apply to a choice between liability and nonliability when there is no reasonable basis in the evidence upon which the choice can be made. *Id.* A mere possibility of causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. *Id.*

In *Barringer v. Wal–Mart Stores, Inc.,* a woman filed a products liability claim against the manufacturer of a plastic boat seat seeking redress for the drowning death of her husband. 699 F.Supp. 1496 (N.D.Okla.1988). Her husband went fishing alone, and later his boat was found capsized. When the boat was recovered, the back portion of the rear boat seat was broken off, the engine was in gear and the throttle was half open. The broken seat back was found the next day. There were no eyewitnesses. *Id.,* 699 F.Supp. at 1497.

In opposing summary judgment, the plaintiff in *Barringer* filed expert testimony that the boat seat was defective and unreasonably dangerous when it left the manufacturer's control and that the boat seat caused the fisherman's death. *Id.,* 699 F.Supp. at 1498. The district judge acknowledged that the expert may be qualified to opine as to the seat's condition when it left the manufacturer's control, but rejected the expert's opinion that the defect caused the drowning because it was unsupported testimony requiring inference upon inference. *Id.* Similarly, the judge rejected circumstantial evidence of the fisherman's level of experience as such evidence failed to support plaintiff's theory any more than defendant's theory. *Id.,* 699 F.Supp. at 1499. Noting the absence of adequate probative evidence on the issue of causation, the district court granted summary judgment for the defendant. *Id.*

Here, plaintiffs argue that the defective design and/or manufacture of the Jet Ski's ® steering cable nozzle fastener caused Johnathon's death. Specifically, plaintiffs contend that a reasonable jury will conclude that, shortly after Johnathon left the marina, the steering cable bolt loosened while he was steering the Jet Ski ®, that the cable became disconnected, that Johnathon lost the ability to steer the craft with the handlebars, that he attempted to call for help by sounding the air horn, that as night approached and the current pushed him away from shore, Johnathon entered the water, and died.

At the outset, there is no expert in this case who can testify that the alleged defect was a factor in Johnathon's death. Plaintiffs' experts admit that they do not have an opinion as to a causal link between the purported defect (the detachment of the steering bolt) and Johnathon's death. Dr.

Daniel DeBehnke, a specialist in emergency medicine, testified at his deposition that he is in no position to offer any opinion to a reasonable degree of medical probability that the potential effects of hypothermia occurred prior to or played any role in Johnathon's death. (Aff. LaFave, ¶ 2, Ex. 1 [Dep. DeBehnke, pp. 63–64, 69, 100]). The following exchange took place in Dr. DeBehnke's deposition:

Q: You formed no opinions in terms of accident reconstruction as far as how things unfolded on the lake the day of the accident, true?

A: True. I've developed scenarios. I don't know which one of them occurred in this case.

. . .

Q: And because of all of the variables that we don't have answers to in this case there's no way for you to pick or choose any one of them as being more probable than not, true?

A: That's correct.

(Aff. LaFave, ¶ 2, Ex. A [Dep. DeBehnke, pp. 100–101])

Similarly, Dr. Weiss, a metallurgist, does not relate his opinion regarding the alleged defect to the accident in this case. He testified that it "seems probable" that the screw came out a point prior to the accident, but he "hadn't addressed it at all." (Aff. LaFave, ¶ 2, Ex. H [Dep. Weiss, pp. 32–34]).

Q: Not having read any of the depositions in this case do you have an opinion as to how this accident happened?

A: Well, all I know is that the ball stud [steering bolt at issue] unscrewed.

Q: When?

A: I don't know when.

. . .

Q: Now, relative to the time of Mr. Solar's death, do you know when the—when the ball stud became unscrewed?

A: I can't tell you specifically when. But it must have been the event that presented him with a serious problem. I mean—

Q: Why must it have been that?

A: I don't know what else would prevent him from coming back in.

Q: Do you have any other basis for "must have been" other than you can't think of anything else?

A: I can't think of anything else. He had fuel. He had an operating machine. And I have not really addressed any of those aspects of the case, so you're really asking the wrong guy.

(Aff.LaFave, ¶ 2, Ex. H[Dep.Weiss, pp. 32–34})

Plaintiffs acknowledge that Weiss and Dr. DeBehnke were not asked to reach a conclusion as to when the steering cable detached or how Johnathon died, and that their testimony has no bearing on the issue of causation. Instead plaintiffs cite the deposition testimony of Ed Holmes, Kawasaki's metallurgist expert, who stated that the last few threads in the steering nozzle were damaged in a way which indicates that the bolt had loosened and the threads were damaged in the front and rear portions of the threaded hold.[3] Plaintiffs ar-

---

3. Plaintiffs' counsel paraphrases the deposition testimony in an affidavit attached to his brief in opposition to the motion for summary judgment. The court denied defendant's motion to strike the affidavit noting there was no prejudice to the defense. In any event, defendant has filed the relevant portions of the deposition with the supplemental affidavit of Daniel LaFave. Notwithstanding the considerable amount of time that has passed since the hearing on this motion, plaintiffs have not sought leave to file additional portions of the transcript or other evidence supporting their argument.

gue that a jury can exercise common sense in assessing whether the evidence as a whole supports Kawasaki's assertion that the bolt just happened to loosen after Johnathon died or whether the Jet Ski ® became unsteerable while Johnathon was driving it.

Plaintiffs' position is troubling in this respect. They propose to ask the jury to exercise common sense regarding when the steering cable bolt came off while experts insist that it is impossible to pinpoint when the alleged failure can't be done. Holmes testified that "time is the hardest thing to put on a metallurgical failure occurred. Just can't be done." (Supp. Aff. LaFave, ¶ 2, Ex. K [Dep. Holmes, p. 36]). Holmes also testified that the damage to the threads could be caused by vibration, input wear during steering the boat, or wave action alone. (Supp. Aff. LaFave, ¶ 2, Ex. K [Dep. Holmes, pp. 33–36]). Similarly, Weiss testified that he had no opinion as to whether the water environment, i.e. bouncing along in the water, would contribute to causing the ball joint to become separated from the armature. (Aff. LaFave, ¶ 2, Ex. H [Dep. Weiss. p. 123]).

Hence, the jurors will be asked to draw inferences based upon the following circumstantial evidence:

► The steering cable was disconnected when the Jet Ski ® was recovered.

► David Solar believes the air horn was in one of the storage compartments of the Jet Ski ® when he used the Jet Ski ® two weekends before Johnathon's death, but it was not there when the Jet Ski ® was recovered.

► Johnathon used his feet as rudders to steer the Jet Ski ® in the past, when riding with another person on the craft.

It is possible that the steering cable detached, that Johnathon could not steer the Jet Ski ® with his feet as he had in the past when he was with a friend, that Johnathon used (and discarded) the airhorn, ignored his father's rule that he never leave the Jet Ski ® unless it was sinking (Aff. LaFave, Ex. D [Dep. David Solar, p. 133]), and decided to swim for shore or jump in and fix the steering cable. But it is at least equally possible that the damage to the steering cable occurred and the airhorn was lost during the three weeks that the Jet Ski ® was tossed around Lake Michigan. The inferences that one must draw to conclude that a defective bolt caused Johnathon's death require speculation and conjecture.

Other circumstantial evidence cited by plaintiffs is either inadmissible or not probative of causation resulting from an actionable defect. For example, the court has not found admissible evidence in the record that the storage compartments contained a one-dollar bill, change, a pair of gloves and a partially empty plastic container of motor oil, or evidence that measurement of the fuel remaining in the gas tank established that only twenty minutes of fuel had been used.[4]

In addition, plaintiffs' counsel asked his own mechanic, Scott Campbell, to measure the amperage drawn on a new battery.

---

4. David Solar testified in his deposition that the Jet Ski ®, when found, "had plenty of fuel" (Supp. Aff. LaFave, ¶ 2, Ex. N [Dep. David Solar, p. 191]), and the Case Activity Report of Warden Jung's Inspection of the Solar Jet Ski ® and the description of photos states that "approximately 3/4 tank of gas remained." To the extent that the Case Activity Report falls within the public records and reports exception to hearsay, that gas remained in the tank is consistent with plaintiffs' theory that Johnathon turned off the Jet Ski ® because of the steering nozzle and defendant's theory that Johnathon turned off the engine for any number of reasons and couldn't get it started again because of the condition of the battery.

Notwithstanding that there has never been a request to name Campbell as an expert, Campbell's affidavit relies on unsupported opinion testimony and inadmissible hearsay in reaching conclusions about the Solar Jet Ski ®. Fed.R.Evid. 602, 801, and 802. Moreover, there is no foundational basis for Campbell's assumption that the new battery he tested was comparable to the condition of the battery in the Solar Jet Ski ® on September 27, 1998. Indeed, the individual who inspected the Jet Ski ® battery soon after the craft was recovered, averred that the cable to the positive terminal was very loose and its connection was corroded. (Aff.Weiand, ¶ 7).

The one final piece of evidence cited by plaintiffs is the affidavit of plaintiffs' counsel. At paragraph 6 of the affidavit, Attorney Brown states:

> In my representation of the Solars, I have had many opportunities to visually inspect the Jet Ski ® and I also have purchased or caused others to purchase replacement parts at Don and Roy's Kawasaki in Brookfield, Wisconsin. I am aware that Kawasaki sells replacement bolts for its personal water craft, including the bolt at issue in this case. I believe that my background in auto mechanics makes me familiar with the mechanics of various means of motorized transportation, including vehicles, snowmobiles and personal water craft. After learning that Kawasaki's position was that the ignition could not be switched from the off position to the on position without a key, I personally checked that theory. I was able to switch the ignition from off to on without the key with little effort.

Aside from the issue of whether Attorney Brown's testimony should be considered on this motion for summary judgment, that the Jet Ski ® ignition switch could turn on and off without a key years after the incident is not probative of the issue of whether an inappropriate fastening device caused the steering cable to disconnect and undermines plaintiffs' assertion that there was no substantial or material change to the Jet Ski ® prior to September 27, 1998. *See Glassey v. Continental Insurance Co.*, 176 Wis.2d 587, 600, 500 N.W.2d 295 (1993) ("When the condition of a product at the time of an accident is substantially and materially different from its condition at the time it left the control of the manufacturer or seller, the plaintiff will be unable to prove its prima facie case and the strict liability claim must be dismissed.") Defendants' expert has testified that a properly functioning switch cannot be turned on without a key. (Aff.Oxton, ¶ 12). In addition, there is deposition testimony that previously Johnathon grounded the craft on a sandbar off of Silver Creek Park after which the steering nozzle wouldn't turn. (Aff. LaFave ¶ 1 [Dep. LaFond, p. 32]). Furthermore, David Solar testified that after the Silver Creek Park accident he replaced the bolt off which the housing pivots. (Aff.Brown, ¶ 8[Dep.LaFond, pp. 72–80). KMC's design expert opined that:

> [T]his boat shows signs of substantial alternation that materially modified the boat from the time it left control of KMC. After it left the factory it appears that the ball bolt was removed and replaced without locking agent. There is no reason to remove the ball bolt in service as the steering cable is affixed with a quick disconnect fitting. (Aff.LaFave, Ex. R).

There is also deposition testimony that there was significant damage to the Jet Ski ® at the time of recovery. David Solar testified in his deposition that he had no idea how scraping "of that magnitude" occurred. (Aff. LaFave, ¶ 2, Ex. D; Dep. David Solar, pp. 113–116). Shane Osborne, Johnathon's stepbrother, testified that he did not recall seeing damage to the

handlebars or hull prior to Johnathon's death. (Aff. LaFave, ¶ 2, Ex. C [Dep. Osborne, p. 45)]. Donna Solar, Johnathon's mother, testified that "[I]t's totaled. Not operable. It's trashed." (Aff. La-Fave, ¶ 2, Ex. E [Dep. Donna Solar, p. 121])

The court has reviewed all of the documents on file, considered the relative probability of various explanations for Johnathon's death, and the reasonable inferences that can be drawn. Mindful that causation is generally a determination of fact for the jury and that evidence on summary judgment is construed in the light most favorable to the non-moving party, here, the evidence suggests that plaintiff's theory is no more likely than defendants' alternate theories: Johnathon could have been wearing the kill switch lanyard loose or not at all, fell of the Jet Ski®, could not reboard the Jet Ski®, and succumbed to hypothermia, drowned within several minutes, or turned off the engine or stopped and couldn't start again. (Aff. Oxton ¶ ¶ 11 – 15, Exs. B–C). "[A] mere possibility of such causation is not enough; when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Merco*, 84 Wis.2d at 460, 267 N.W.2d 652. Plaintiffs' case rests on "conjecture, unproved assumptions, and mere possibilities," *see id*, and does not allow a jury to make a rational, nonspeculative finding that a product defect caused Johnathon's death. The events of September 27, 1998, were horribly tragic, but without more, plaintiffs' case should not go to a jury.

Now, therefore,

IT IS ORDERED that defendants' motion for summary judgment on plaintiffs' products liability claim is granted.

IT IS FURTHER ORDERED that this case is dismissed.