WESTFIELD INSURANCE COMPANY, Plaintiff,

and

Christopher and Shannon Scharmer, Involuntary Plaintiffs,

v.

J.C. PENNEY CORPORATION, INC., Liberty Mutual Insurance Company, Decor by Dene, Inc., Atlantic Mutual Insurance Company, Chau's Electrical Co., Ltd., and Federal Insurance Company, Defendants.

No. 05–C–0622–C.

United States District Court, W.D. Wisconsin.

Oct. 26, 2006.

Werner Erich Scherr, Milwaukee, WI, for Plaintiff.

Timothy A. Hawley, Sellpflug, Janssen, Hammer Kirschling & Bartels, S.C., De Pere, WI, Joseph M. Wirth, Piper & Schmidt, Emily B. Di Ulio, Borgelt, Powell, Peterson & Frauen, Milwaukee, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

Plaintiff Westfield Insurance Company and involuntary plaintiffs Christopher and Shannon Scharmer bring this claim for monetary damages against defendants J.C.

Penney Corporation, Liberty Mutual Insurance Company, Decor by Dene, Inc., Atlantic Mutual Insurance Company, Chau's Electrical Co., Ltd. and Federal Insurance Company. Plaintiffs allege that defendants are liable for their roles in producing and selling a lamp and cord that caused fire damage to involuntary plaintiffs' residence. Jurisdiction is present under 28 U.S.C. § 1332. This case is scheduled for trial on November 13, 2006.

Defendants Decor by Dene, Atlantic Mutual, J.C. Penney and Liberty Mutual moved to join defendants Chau's and Federal's motion for summary judgment. Dkt. # 48. Neither plaintiffs nor defendants Chau's or Federal objected to this motion, which I will grant.

Now before the court is defendants Chau's and Federal's motion for "summary judgment." Although this motion is framed as a motion for summary judgment, the parties' briefs focus on the admissibility of the testimony of plaintiffs' proposed expert witnesses, David Halverson, Paul Hansen and Chris Korinek. The

parties appear to agree that without the testimony of the experts, plaintiffs could not prevail on their negligence or strict liability claims against defendants. The real question to be answered, therefore, is whether Halvorsen, Hansen and Korinek may testify at trial. If so, the case may proceed to trial. If not, plaintiffs will have no evidence to support their negligence or strict liability claims and summary judgment may be granted in defendants' favor. Because I conclude that Halvorsen, Hansen and Korinek may testify at trial, defendants' motion for summary judgment will be denied.

■ Plaintiffs' response to defendants' motion includes a lengthy discussion of the doctrine of *res ipsa loquitur* and a discussion of other "expert" testimony that plaintiffs assert supports their case with respect to causation. However, because defendants' motion for summary judgment was framed narrowly as a *Daubert* challenge to plaintiffs' experts Halvorsen, Hansen and Korinek, I need not address these arguments to resolve this motion.[1]

---

1. In declining to address the question of applicability of the theory of *res ipsa loquitur* at this time, I do not suggest that the question does not matter. As I understand the Wisconsin law on the propriety of a *res ipsa loquitur* instruction, plaintiffs seeking such an instruction must show that the allegedly defective product was in the exclusive control of the defendant and that the accident would not have occurred in the absence of defendant's negligence. *Peplinski v. Fobe's Roofing, Inc.,* 193 Wis.2d 6, 17, 531 N.W.2d 597, 601 (1995). It appears undisputed that the lamp at issue was not in the exclusive control of defendant Chau's while it was in plaintiffs Scharmers' home. It may be possible for plaintiffs to satisfy the test by showing that the Scharmers did not handle the lamp improperly or change it in any way. In *Jagmin v. Simonds Abrasive Co.,* 61 Wis.2d 60, 73–74, 211 N.W.2d 810, 817 (1973), the Supreme Court of Wisconsin held that a res *ipsa loquitur* inference could be drawn if the plaintiff could show that he was using the product

properly and "can negative other possible causes of the product failure since it left the manufacturer's control." Defendants argue that the *Jagmin* case should not be followed because it is an outlier and has been followed only twice, once in 1974 *(Powers v. Hunt–Wesson Foods, Inc.,* 64 Wis.2d 532, 219 N.W.2d 393,) and once in 1978 *(Rennick v. Fruehauf Corp.,* 82 Wis.2d 793, 264 N.W.2d 264), but they cannot show that it has been overruled or abrogated. Even assuming, however, that *Jagmin* is still good law, it remains to be seen how plaintiffs intend to prove that a lamp in the living room of a family with children and a dog could not have been misused or damaged in the time it was in the home. If they can overcome this hurdle, another problem lurks. It appears from comments in the parties' briefs that defendant Chau's did not attach the cord and lamp. If this is true, how will plaintiffs be able to show that nothing could have happened to the cord between the time the lamp left Chau's and its arrival at the Scharmers' residence? I will

On August 28, 2006 defendants filed a "Motion to Strike" the "8/17/06 affidavit of Chris Korinek, Timothy Curtis as an expert witness and Ronald Anderson as an expert witness." Because I have not relied on Korinek's affidavit or the statements of Curtis or Anderson that were included in plaintiffs' response to defendants' motion for summary judgment, I will deny defendants' motion to strike as unnecessary. Whether Korinek will be allowed to testify at trial about the matters in his August 17, 2006 affidavit and whether Curtis and Anderson will be allowed to testify at all are matters I will take up at the final pre-trial conference.

From the parties' proposed findings of fact, I find the following facts to be material and undisputed.

## FACTS

### A. *Parties*

Involuntary plaintiffs Chris and Shannon Scharmer are husband and wife. They are residents of the state of Wisconsin and own a residential property located in Beloit, Wisconsin.

Plaintiff Westfield Insurance Company is incorporated under the laws of the state of Ohio and has its principal place of business in Ohio. At all times relevant to the complaint, plaintiff Westfield provided homeowners insurance to involuntary plaintiffs.

Defendant J.C. Penney Corporation, Inc. is incorporated under the laws of the state of Delaware and has its principal place of business in Texas.

Defendant Liberty Mutual Insurance Company is incorporated under the laws of the state of Massachusetts, where it has its principal place of business. At times relevant to the complaint, defendant Liberty

Mutual provided liability insurance to defendant J.C. Penney.

Defendant Decor by Dene, Inc. is incorporated under the laws of the state of New York, where it has its principal place of business.

Defendant Atlantic Mutual Insurance Company is incorporated under the laws of the state of New York and has its principal place of business in New Jersey. At times relevant to the complaint, defendant Atlantic Mutual provided liability insurance to defendant Decor by Dene.

Defendant Chau's Electrical Company, Ltd. is incorporated under the laws of the People's Republic of China. Its principal place of business is in Hong Kong.

Defendant Federal Insurance Company is incorporated under the laws of the state of Indiana and has its principal place of business in New Jersey. At times relevant to the complaint, defendant Federal provided liability insurance to defendant Chau's.

### B. *The Fire at the Scharmers' Home*

On December 9, 1999, a fire occurred at the home of involuntary plaintiffs. The fire is believed to have started in the living room, which is located on the first floor of the two-story house. Approximately two months before the fire, involuntary plaintiff Shannon Scharmer purchased a lamp from defendant J.C. Penney. Defendant Chau's was the designer and manufacturer of the lamp's electrical cord.

The J.C. Penney lamp was located on a table in the southeast portion of the living room, directly behind a couch. The lamp was plugged into an extension cord, which was plugged in to the nearest electrical outlet, located on the south wall of the living room. There was a candle on the same table as the lamp, and involuntary

take up these questions at the final pretrial conference.

plaintiff Shannon Scharmer believes there may have been Christmas decorations on the table as well. There were numerous other electrical fixtures in the living room, including Christmas lights and other lamps.

On December 8, 1999, the evening before the fire occurred, involuntary plaintiff Shannon Scharmer lit a candle on the table that held the lamp. She recalls that she extinguished the candle before going to sleep that evening. When involuntary plaintiff Shannon Scharmer left the house on the morning of the fire, she recalls that the bulb on the J.C. Penney lamp was off. She returned home at noon and discovered the fire.

Plaintiff Westfield insured involuntary plaintiffs at the time of the fire. Pursuant to the insurance policy, plaintiff Westfield made payments of more than $617,000 to involuntary plaintiffs.

### C. David Halverson

David Halverson is a senior investigator for Engineering & Fire Investigation and has been employed by the company since 1995. His job is to investigate the origin and cause of fires and explosions. Prior to taking this position, he worked for almost twenty years as a deputy state fire marshal for the Wisconsin Department of Justice, Division of Criminal Investigation. In that role, he investigated crimes assigned to the State Arson Bureau. Halverson is a certified firefighter with the State of Wisconsin and a certified fire investigator through the International Association of Arson Investigators. He is not an engineer.

Halverson was retained by plaintiff Westfield to undertake a cause and origin investigation with respect to the fire at involuntary plaintiffs' home. Halverson conducted his investigation of the fire scene on December 10, 1999. He spoke with involuntary plaintiffs and the fire department. Halverson's findings are set forth in his initial report, dated December 27, 1999. In his report, Halverson noted that evidence of open flames was limited to the living room. Based on photographs, fire department information and the fire, burn and heat patterns that he found in the living room, Halverson identified the couch and table behind it (on which the J.C. Penney lamp was sitting) as the area where the fire had begun.

Halverson stated in his report that the fire "was caused by a failure of either a lamp sitting on the table of the origin area or its service cord." He concluded also that the fire was electrical in nature. To arrive at these conclusions, he "eliminated applicable causes, was left with the lamp and/or its cord and identified them in totality as one or the other being the cause." For example, he eliminated the candle that had been sitting next to the lamp as a possible fire source because involuntary plaintiff Shannon Scharmer told him that she had extinguished it the night before the fire. He eliminated batteries in toys under the table because of information provided to him by investigator Paul Hansen. He eliminated a "swag" lamp in the living room because it was not in the area of the fire's origin. Finally, he noted that the "fire patterns on the sofa clearly show and match up to the damages on the table immediately to the rear side of the sofa. Those fire patterns clearly emanate from the location [where] the table lamp was sitting at the time of the fire's occurrence." Halverson could not find, and did not test, the candle that had been on the table. He also did not test the toys that had been underneath the table.

Halverson did not conduct any testing of the lamp, cord or extension cord. Halverson did not state what particular defect in the lamp or cord could have caused the

fire. Instead, he deferred to the opinion of Hansen, an electrical engineer, regarding mechanical issues related to the cord.

### D. *Paul Hansen*

Paul Hansen is an electrical engineer who is employed by Engineering & Fire Investigation. He has been a licensed engineer for nearly 25 years. Hansen was asked by Halverson to do "non-destructive testing" of items that had been in involuntary plaintiffs' home at the time of the fire. Hansen did not visit the scene of the fire.

Hansen began his work investigating the fire in September 2003. He issued his report on March 10, 2004. In his report, he stated that he noted electrical arcing in the lamp's power cord that was "consistent with it having failed in a manner causative of the fire." Hansen stated that he eliminated other potential causes of the fire.

Electrical arcing is a "plasma phenomena where electrical energy crosses a semiconductive gap." An arc can occur when a lamp is turned off. Electrical arcing "is caused when conductors touch each other if there is some other material between the conductors allowing the conduction of electrical energy." An arc may occur after a fire has started if the fire causes the plastic insulation in an electrical cord to carbonize, allowing the transmittal of electrical energy between the conductors inside the cord.

In his deposition testimony, Hansen said, "The arc in my opinion was the result of the initial defect in the cord and over a period of time caused an arc and it just happened to be next to the back of the couch and it found combustible materials." He stated that, looking only at the arc itself, it is possible that the arc was caused by an external fire.

Hansen stated that he believes that the arc occurred where the cord was bent over the edge of the table, which he identified as the area of the cord that experienced the most mechanical stress. He did not identify specifically why an electrical cord bending over a table top causes mechanical stress or why mechanical stress would be likely to cause arcing. However, Hansen noted that the mechanical stress put on the cord was similar to the stress put on every table lamp, which is one of the reasons he concluded the cord was defective.

After the fire, 32 inches of cord remained attached to the male plug end of the cord and five and a half inches remained at the base of the lamp. The 19 inches closest to the plug were still covered with insulation after the fire. Hansen did not examine this portion of the cord to determine whether the remaining insulation was sufficient, and he was not aware of the industry standards regarding insulation for such an electrical cord. However, in his deposition testimony, he stated that he did not examine this portion of the cord to determine how much insulation was on it because it would have been irrelevant, as there was no arcing in that section of wire. Hansen stated that there was an unrecoverable, unknown amount of copper wire from the cord that had been vaporized or melted. Hansen does not know the original length of the electrical cord because not all of the cord was recovered. He based his opinion on finding evidence of arcing in one section of the cord.

Hansen did not perform any "arc mapping" of the cord. "Arc mapping" is a method used to determine where an initial electrical arc occurred and is done by charting the location of all arcs along an electrical cord. Hansen stated that he saw only one arc on the remaining cord segments and that "arc mapping" is appropriate only when there is evidence of multiple arcs. When asked by defendants why he did not do any arc mapping with respect to

the remaining cord in this case, he said that the arc map of a single arc would be "a no-brainer."

### E. *Chris Korinek*

Chris Korinek is an electrical engineer who was retained by plaintiff Westfield's counsel in September 2004. In his August 25, 2005 report, he stated that he was asked to review the evidence and determine whether Hansen's report was consistent with it. He did additional work on the case in July 2006. He conducted x-rays of remnants from the fire, including the electrical cord that was attached to the J.C. Penney lamp. In his opinion, the x-rays indicate where arcing occurred in the lamp cord. The x-ray analysis identified other segments of the cord containing masses that could have been indicative of arcing.

Korinek prepared an arc map showing that arcing occurred in the cord somewhere between the tabletop and where it may have been wrapped around a table leg, which is the same range identified by Hansen. Korinek identified the cord as the likely source of the fire and excluded other possible sources, including the extension cord and six-plug adaptor.

Korinek could not identify the precise defect in the lamp cord that caused the arcing or state whether the identified arc in the cord was the cause of the fire. He stated that the arc could have been caused by the fire, rather than the cause of the fire. However, at his deposition, Korinek said that he believed "within a reasonable degree of scientific probability, that there was a defect in the lamp cord." Dkt. # 68 at 71. He went on to state that he concluded that "the defect was either damage to the insulation of conductors that resulted in parallel arc or series arc based on the evidence that [he had]." *Id.* However, in his deposition testimony, he said he was not able to state with a reasonable degree of probability whether the conductors were manufactured too close together or whether there was insufficient insulation between the two conductors.

Korinek stated that he believed that the damage occurred before the involuntary plaintiffs bought the lamp. He based this belief upon a conversation that he had with involuntary plaintiff Shannon Scharmer about her care of the lamp and cord after she purchased them. Korinek was not able to state with a reasonable degree of scientific certainty that the lamp cord was defective before it left Chau's possession. Korinek did not identify any industry standards the lamp or cord violated.

## OPINION

■ In a diversity case, state law governs substantive claims, while federal law governs all procedural and evidentiary issues, including the admissibility of expert testimony. *Klonowski v. International Armament Corp.,* 17 F.3d 992, 995 (7th Cir.1994). The question, then, is whether the testimony of Halverson, Hansen and Korinek meets the requirements of Fed. R.Evid. 702, which governs the admissibility of expert opinions in federal court. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

■ Under the analysis set forth by the United States Supreme Court in *Dau-*

bert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), a district court must "ensure that any and all scientific testimony or evidence admitted [at trial] is not only relevant, but reliable." In determining what testimony is reliable and what is not, the court is to consider whether the scientific theory can be and has been tested; whether the theory has been subjected to peer review and publication; the theory's known or potential rate of error when applied; and whether the theory has been "generally accepted" in the scientific community. Id. at 593–94, 113 S.Ct. 2786. This evidentiary inquiry is meant to be flexible and fact specific, which means that a court should use, adapt, or reject Daubert factors as the particular case demands. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141–42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

 The Court of Appeals for the Seventh Circuit has held that when a district court is deciding whether to admit proffered expert testimony, it must determine "(1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue." Walker v. Soo Line Railroad Company, 208 F.3d 581, 586 (7th Cir.2000). To determine whether expert testimony is relevant, the court "must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." Smith v. Ford Motor Company, 215 F.3d 713, 718 (7th Cir.2000). Although an expert may testify to an ultimate issue in the case, Fed.R.Evid. 704, United States v. Baskes, 649 F.2d 471, 479 (7th Cir.1980), he "need not have an opinion on the ultimate question to be resolved by the trier of fact in order to satisfy [the relevance] requirement." Smith, 215 F.3d at 719. Finally, it is not the role of the court to

determine whether an expert's conclusion is correct; this is the province of the jury. Id. (noting that "whether [an expert's] theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert....").

From my review of the parties' proposed findings of fact, I conclude that Halverson, Hansen and Korinek are qualified to testify to the opinions they have rendered in this case. Although defendants' challenges to plaintiffs' experts' conclusions are fodder for cross-examination at trial, they do not demonstrate that the opinions fail to meet the requirements of Fed. R.Evid. 702 and Daubert.

### A. David Halverson

Halversen is a certified fire investigator who has nearly thirty years of experience. Halversen was hired by plaintiffs and went to the involuntary plaintiffs' home on the day after the fire. He determined that the fire began in the living room because it was the only place where he found evidence of open flames. He studied the burn, fire and heat patterns and considered fire department information to reach his conclusion that the fire began behind the couch. At that point, he eliminated other potential fire sources on the basis of their proximity to the couch and his conversation with involuntary plaintiff Shannon Scharmer. This left him with the J.C. Penney lamp and cord as a potential source of the fire. Halverson is not an electrical engineer and does not purport to know what about the lamp or cord could have caused the fire.

 The parties appear to dispute almost nothing with respect to Halverson's credentials or methodology. Both sides appear to agree that he has the proper credentials to serve as an expert regarding the origin of the fire and that he did not

employ unreliable methods in his investigation. Defendants do not appear to dispute that one of the proper ways for an expert to identify the source of a fire is by eliminating other potential sources, which is what Halverson did. Defendants dispute Halverson's *conclusion* that the lamp and cord were the cause of the fire. Whether Halverson's conclusion is accurate is a decision that the jury must make, not the court. *Smith*, 215 F.3d at 719.

In their effort to disqualify Halverson's testimony as irrelevant, defendants point out repeatedly that Halverson is not an engineer and performed no tests on the lamp or cord. I find it odd that defendants take this tack, when the two alleged deficiencies are neither disputed nor relevant. Halverson need not be an expert about every aspect of this case in order to provide relevant expert testimony about a particular issue. The parties agree that Halverson is an expert for the purposes of giving testimony about where the fire began. Given the importance of this issue to the case, Halverson's expert testimony easily meets the relevance requirement. Defendants' motion will be denied with respect to Halverson's testimony.

## B. *Paul Hansen*

Hansen, a licensed electrical engineer, examined remnants of the lamp cord. From his examination, he identified an area of the cord where he believed that electrical arcing had taken place. He testified that this was likely the area of the cord that had experienced the most electrical stress, something he believed could have been caused by the cord having been bent over a tabletop. He testified that the cord was defective because this kind of mechanical stress is a common one for electrical cords.

The parties do not dispute that Hansen has the professional qualifications necessary to offer expert testimony regarding electrical wiring and failures. They do dispute the reliability of his methods for arriving at his conclusion that the cord attached to the J.C. Penney lamp was defective and that arcing in the cord was "consistent with it having failed in a manner causative of the fire."

Defendants argue that Hansen's testimony does not pass *Daubert's* requirements because he offers only "conclusory findings and unsubstantiated beliefs." Dkt. # 42 at 14. Defendants argue that Hansen's failure to x-ray the cord, calculate its length or prepare an arc map makes his opinion unreliable. However, it is undisputed that Hansen concluded that arcing occurred in the cord, that arcing was evidence of a defect and that his conclusions were based upon his examination of the cord and review of Halversen's report. Defendants have not adduced any evidence that this was not a legitimate way for Hansen to determine that there was arcing in the cord, that the cord was defective and that it caused the fire at the home of involuntary plaintiffs. Although it might have preferable for Hansen to do additional testing to arrive at his conclusion, his methods were not obviously unreliable.

Finally, defendants suggest that Hansen's opinion is too speculative to withstand *Daubert's* requirements because there is another possible reason that the cord arced, namely, that it caught on fire and then arced. However, if defendants were correct, anytime there were several legitimate explanations for an occurrence, no expert would be able to testify about any of them. This cannot be the correct result.

In conclusion, Hansen's opinions withstand *Daubert's* relevance and reliability

requirements. Consequently, defendants' motion will be denied with respect to Hansen's testimony.

### C. *Chris Korinek*

 Korinek reviewed Hansen's report and the evidence to determine whether they were consistent, before concluding that they were. Later, Korinek x-rayed the cord remnants, which indicated where an arc occurred, and prepared an arc map. Korinek concurred with Hansen's assessment about the location of the arc in the cord. From the tests that he conducted, Korinek concluded with a "reasonable degree of scientific probability" that there was a defect in the cord. He specified that the defect was the result of either damage to the insulation or conductors. Although he was not able to specify which of the two possibilities actually caused the arc, this did not alter his overall conclusion that the cord was defective.

 Defendants do not appear to dispute Korinek's qualifications. Further, Korinek performed precisely the tests that defendants fault Hansen for not performing. Thus, I presume defendants agree that these are reliable tests to determine whether and where electrical arcing occurred within a cord. Instead, defendants assert that Korinek offered no opinion to a reasonable degree of engineering probability that Chau's cord was defective or that Chau's was negligent, and that therefore, his opinions are not relevant. Neither argument is persuasive. First, Korinek's opinion is that there was a defect in the cord generally; he arrived at this conclusion using methods that the parties agree were reliable. The fact that Korinek cannot identify the particular defect does not make his testimony irrelevant. Second, defendants attack Korinek's testimony because he does not state that Chau's was negligent and that this negligence was the cause of the fire at involuntary plaintiffs'

home. However, this is the ultimate issue that the trier of fact must resolve in this case. Korinek's inability or unwillingness to offer an opinion about this does not make his testimony irrelevant. *See, e.g., Walker,* 208 F.3d at 587.

In conclusion, Korinek's opinions withstand *Daubert's* relevance and reliability requirements. Consequently, defendants' motion will be denied with respect to Korinek's testimony.

## ORDER

IT IS ORDERED that:

1. The motion of defendants J.C. Penney Corporation, Liberty Mutual Insurance Company, Decor by Dene, Inc. and Atlantic Mutual Insurance Company to join in the motion of defendants Chau's Electrical Co., Ltd. and Federal Insurance Company for summary judgment is GRANTED.

2. Defendants Chau's Electrical Co., Ltd. and Federal Insurance Company's motion to strike the 8/17/06 affidavit of Chris Korinek, Timothy Curtis as an expert witness and Ronald Anderson as an expert witness is DENIED as unnecessary.

3. The motion for summary judgment filed by defendants Chau's Electrical Co., Ltd. and Federal Insurance Company is DENIED.