**Lissys CORTES, et al., Plaintiffs,**

**v.**

**HONEYWELL BUILDING SOLUTIONS SES CORPORATION, et al., Defendants.**

**Case No. 14–20429–CIV.**

United States District Court, S.D. Florida.

Signed Aug. 12, 2014.

David Mark Brandwein, David M. Brandwein, Fort Lauderdale, FL, Jeannete C. Lewis, Lewis Legal Group, P.A., Robert J. McKee, The McKee Law Group LLC, David Wayne Brill, Brill & Rinaldi, The Law Firm, Weston, FL, Joseph J. Rinaldi, Jr., Anely Michelle Hernandez, Brill & Rinaldi, Coral Gables, FL, Juan Manuel Garcia, Jr., Brill Rinaldi Garcia, Miami, FL, for Plaintiffs.

Jannine L. Lee, Todd A. Noteboom, Stinson, Leonard, Street, LLP, Minneapolis, MN, Scott N. Wagner, Justin Scott Brenner, Lori P. Lustrin, Bilzin Sumberg Baena Price & Axelrod, LLP, Miami, FL, for Defendants.

## *ORDER*

CECILIA M. ALTONAGA, District Judge.

**THIS CAUSE** comes before the Court upon Defendants, Honeywell Building Solutions SES Corporation ("Honeywell

Building") and Honeywell International, Inc.'s ("Honeywell International['s]") (collectively, "Defendants[']") Motion to Dismiss First Amended Complaint ... ("Motion") [ECF No. 28]. Plaintiffs, Lissys Cortes ("Cortes") and David Knight ("Knight") filed their Response ... ("Response") [ECF No. 37], and Defendants replied ("Reply") [ECF No. 41].[1] The Court has carefully reviewed the parties' written submissions and applicable law.

## I. BACKGROUND[2]

This case involves claims by Plaintiffs Lissys Cortes ("Cortes") and David Knight ("Knight"), in connection with Defendants' alleged negligence and gross negligence in replacing analog electric meters with Smart Meters in Plaintiffs' homes. (See Am. Compl. 22–29). In 2009, Florida Power & Light ("FPL") implemented a program to replace commercial and residential customers' analog electric meters with Smart Meters. (See id. ¶ 17). Smart Meters purport to provide additional information regarding power usage and more accurate readings than their analog counterparts. (See id. ¶ 18). FPL formulated, deployed, and managed the Smart Meter installation plan and hired Defendants, Honeywell Building and Honeywell International, to perform the installations. (See id. ¶ 23).

The electric meter, property of FPL, is housed inside an enclosure or "box" known as a "meter can" that connects the meter to the electrical infrastructure of a residential customer's home. (Id. ¶ 15). FPL owns and is responsible for all Smart Meters, while homeowners own and are responsible for the meter can and their side of the connection—all of the wiring in the home that connects to the meter. (See id. ¶¶ 7, 15, 17). An electric meter connects to the home via "male" metal prongs, which connect into "female" receptors inside a meter can. (See id. ¶ 16). Before the advent of Smart Meters, the male and female meter connections had varying dimensions, requiring female receptors to be properly matched with male connectors. (See id.). FPL's installation plan required replacing existing male connectors with various iterations of Smart Meter connectors, each designed differently and possessing different male connectors. (See id. ¶¶ 17, 20).

One or more of the Defendants entered Cortes's property without her knowledge and replaced her working analog electric meter with a Smart Meter. (See id. ¶ 2). Her meter was not in need of repair or replacement due to obsolescence or wear. (See id.). "As a result of improper installation of the Smart Meter," Cortes "suffered arcing in her meter and resulting economic damages," including "the cost of repair or replacement of property and the cost of updating components of her property to current code due to reasonably necessary repair work caused by the arcing...."[3] (Id. ¶ 3). The damages to the

---

1. When citing to Plaintiffs' Amended Complaint [ECF No. 20] and Response, the Court uses the page numbers provided by the Court's electronic case management database ("CM/ECF").

2. The facts, taken from the Amended Complaint, are presented in the light most favorable to Plaintiffs and accepted as true.

3. Electrical arcing is a "plasma phenomen[on] where electrical energy crosses a

semi-conductive gap." Westfield Ins. Co. v. J.C. Penney Corp., Inc., 466 F.Supp.2d 1086, 1091 (W.D.Wis.2006) (alteration added; citation and internal quotation marks omitted). Arcing may occur when electrical currents in the wiring "arc" or "jump" from one conductor to another, and undesired electrical arcing may result from electrical currents that overwhelm an electrical circuit or switch. Rivaux v. Fla. Power & Light Co., 78 So.2d 714, 716 (Fla.1955) (describing a high electrical volt-

meter and associated equipment were not on the "Customer's side of the point of delivery." (*Id.* ¶ 39). Cortes was:

> forced to hire an electrician who, on or about October 11, 2013, removed the existing meter blocks and installed new meter terminals on A and B phases, installed new lug terminals, installed new feeder wires, piped, wired and installed a new dual rod grounding system, and charged for the requisite permitting and inspection fees.

(*Id.* ¶ 3). Cortes contends the arcing damaged her air conditioner and pool motor. (*See id.*).

One or more of the Defendants similarly entered Knight's property without his knowledge and replaced his working analog electric meter with a Smart Meter. (*See id.* ¶ 4). His meter was not in need of repair or replacement. (*See id.*). "As a result of improper installation of the smart meter," Knight "suffered arcing in his meter can[ ] and resulting economic damages." (*Id.* ¶ 5 (alteration added)). He "was forced to hire an electrician who, on or about October 22, 2013, removed existing burnt lug on 'A' phase for line side, installed a new meter lug, replaced a neutral lug, and charged the requisite permitting and inspection fees." (*Id.*). The damages to the meter and associated equipment were not on the "Customer's side of the point of delivery." (*Id.* ¶ 39).

Plaintiffs state four claims against Defendants: one count of negligence and one count of gross negligence against each Defendant. (*See id.* 22–29). Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Potential Class") pursuant to Federal Rule of Civil Procedure 23. (*See* Am. Compl. ¶ 40).

The proposed Potential Class consists of: "All persons and entities who suffered property damage and consequential financial loss as a result of [Defendants'] improper Smart Meter installation." (*Id.* ¶ 41 (alteration added)).

Plaintiffs allege Defendants breached their duties "to install the Smart Meters in a competent, safe[,] and reasonable manner" and "warn of any risks associated with improper installation of the Smart Meters." (*Id.* ¶¶ 55–56 (alteration added); *see id.* ¶¶ 61–62). Plaintiffs claim Defendants' installation practices were unsafe and improper:

> Defendants' employees or agents would strike the old meter with extreme force to knock the meter loose. Then they would strike the Smart Meter with extreme force to install it in place of the old meter. What should take five to seven minutes was taking a mere 90 seconds, and, as a consequence, the "Female" receptors would bend and expand the [sic] during removal of the old meter and the "Female" receptors would crush during the installation of the new Smart Meter.

(*Id.* ¶ 36). Plaintiffs further allege Defendants breached their duty of care with gross negligence, "engaging in a course of conduct such that the likelihood of injury to other persons or property was known by Defendant[s] to be imminent or clear and present...." (*Id.* ¶ 69 (alteration added); *see id.* ¶ 75). "Defendants' improper installation of the Smart Meters is the only reason Plaintiffs and every putative class member suffered the damages they did." (*Id.* ¶ 6). Plaintiffs sought reimbursement for their damages from FPL, but FPL

---

age that would "arc" or "jump" from the wiring to the equipment). *See generally Citizens Prop. Ins. Corp. v. Simkar LLC,* 813 F.Supp.2d 1356, 1359–60 (M.D.Fla.2011) (dis-

cussing electrical arcing in a lamp socket); *Westfield Ins. Co.,* 466 F.Supp.2d at 1091 (same).

denied the request asserting the homeowner, rather than FPL, "is required to bear the cost of the damage because it occurred on the [homeowner]'s side of the connection...." (*Id.* ¶ 7 (alterations added)).

Defendants move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (*See* Mot. 5–15).[4]

## II. LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. 1955. Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955 (alteration added)). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937).

## III. ANALYSIS

Defendants assert FPL's Tariff (*see* Mot., Ex. B ("FPL Tariff") [ECF No. 28-2]) bars the negligence claims, as it expressly exempts "FPL and its servants, agents[,] and employees from liability arising out of interruptions in service or fluctuations in voltage caused by ordinary negligence." (Mot. 6 (alteration added)). The FPL Tariff "bars customers from recovering any damages relating to the [c]ustomer's side of the meter connection." (*Id.* 7 (alteration added)). Defendants also state Plaintiffs have not alleged a plausible negligence claim because they fail to plead Defendants owed or breached a duty of care or that Defendants' breach caused Plaintiffs' harm. (*See id.* 10–14). As to the gross negligence claim, Defendants insist the Amended Complaint "contains no allegations of 'imminent' or 'clear and present' danger, let alone [Defendants'] awareness of such a danger." (*Id.* 15 (alteration added)).

Plaintiffs maintain the FPL Tariff does not bar their claims because Defendants are not agents of FPL with respect to the Tariff and because Plaintiffs seek damages outside the scope of the Tariff's provisions. (*See* Resp. 5–16). Plaintiffs insist they have stated plausible claims for both negligence and gross negligence. (*See id.* 18–24).

### A. FPL Tariff

Defendants raise the FPL Tariff as a bar to Plaintiffs' negligence and gross neg-

---

4. Defendants' alternative request the Court strike the pleading's class allegations (*see id.* 15–19) is not addressed given class certification issues will be handled in the order on Plaintiffs' August 1, 2014 Motion for Class Certification [ECF No. 61].

ligence claims. (*See* Mot. 5–10; Reply 2–5). Sections 2.5 and 2.7 of the FPL Tariff address FPL's liability. Section 2.5 of the Tariff provides:

> *Continuity of Service.* The Company [FPL] will use`reasonable diligence at all times to provide continuous service at the agreed nominal voltage, and shall not be liable to the Customer for complete or partial failure or interruption of service, or for fluctuations in voltage, resulting from causes beyond its control or through the ordinary negligence of its employees, servants or agents. The Company shall not be liable for any act or omission caused directly or indirectly by strikes, labor troubles, accident, litigation, shutdowns for repairs or adjustments, interference by Federal, State or Municipal governments, acts of God or other causes beyond its control.

(FPL Tariff § 2.5 (alteration added)).[5] Similarly, Section 2.7 states:

> *Indemnity to Company.* The Customer shall indemnify, hold harmless and defend the Company from and against any and all liability, proceedings, suits, cost or expense for loss, damage or injury to persons or property, in any matter directly or indirectly connected with, or growing out of the transmission and use of electricity on the Customer's side of the point of delivery.

(*Id.* § 2.7).[6]

■ "It is well established that a limitation of liability contained in a tariff is an essential part of the rate, and that the consumer is bound by the tariff regardless of his knowledge or assent thereto. Tariffs are even recognized as having the force and effect of law." *Potts v. Fla. Power &* *Light Co.*, 841 So.2d 671, 672 (Fla. 3d DCA 2003) (quoting *Landrum v. Fla. Power & Light Co.*, 505 So.2d 552 (Fla. 3d DCA 1987)). Where words in a tariff are used in their ordinary meaning, courts apply a set of construction maxims derived from contract and statutory interpretation, avoiding unjust, absurd, or improbable interpretations; considering the tariff as a whole; strictly construing its exceptions; avoiding nullifying specific or substantial tariff provisions; and construing ambiguity against the tariff's drafter. *PacifiCorp v. Northwest Pipeline GP*, 879 F.Supp.2d 1171, 1205 (D.Or.2012) (citing *Coca–Cola Co. v. Atchison, T. and S.F. Ry. Co.*, 608 F.2d 213, 220–222 (5th Cir.1979)). Under Florida law, "[e]xculpatory provisions which attempt to relieve a party of his or her own negligence are generally looked upon with disfavor, and Florida law requires that such clauses be strictly construed against the party claiming to be relieved of liability." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1166 (11th Cir.2009) (alteration in original; citation and internal quotation marks omitted). Nevertheless, such provisions are valid and enforceable where the intention is made clear and unequivocal. *See id.* at 1166–67 (citations omitted).

■ Plaintiffs contend sections 2.5 and 2.7 of the FPL Tariff do not bar their claims because: Defendants are not "agents" of FPL; Plaintiffs are not suing for failure or interruption of service or for fluctuation in voltage; the meters and related equipment are not considered the "Customer's side of the point of delivery"; and it is against public policy to provide an exemption from a suit for gross negli-

---

**5.** Section 13.1 of the Tariff defines the "Company" as FPL. (*Id.* § 13.1).

**6.** Section 2.3 of the Tariff defines "point of delivery" as "the point where the Company's wires or apparatus are connected with those of the Customer. The point of delivery shall be determined by the Company." (*Id.* § 2.3).

gence. (*See* Resp. 5–13; *see also* Am. Compl. ¶¶ 38–39). The parties agree whether the Tariff's indemnification clause applies to Defendants depends on whether Defendants are independent contractors or agents of FPL. *See Del Pilar v. DHL Global Customer Solutions (USA), Inc.*, 993 So.2d 142, 145 (Fla. 1st DCA 2008) ("Generally, a principal is not vicariously liable for the negligence of its independent contractor, but the principal is liable for the negligence of its agent." (citing *Fla. Power & Light Co. v. Price*, 170 So.2d 293 (Fla.1964))). "The standard for determining whether an alleged agent is an independent contractor is the degree of control exercised by the employer or owner of the alleged agent." *Johnson v. Unique Vacations, Inc.*, 498 Fed.Appx. 892, 895 (11th Cir.2012) (quoting *Vermeulen v. Worldwide Holidays, Inc.*, 922 So.2d 271, 274 (Fla. 3d DCA 2006) ("For the agency relationship to exist, there must be some affirmative evidence of ownership, operation or control.")).

■ Here it is Defendants—not Plaintiffs—who wish to have the Court find an agency relationship existed in order to secure dismissal of Plaintiffs' claims pursuant to the Tariff's language. But an agency relationship is nowhere pleaded. Plaintiffs very clearly allege Defendants were not agents of FPL but were instead independent contractors, as "FPL did not retain the right of control, or exercise actual control, over the Defendants' Smart Meter actual installation activities in a manner. sufficient enough to deem the Defendants employees or agents of FPL." (Am. Compl. ¶ 30). "Defendants' employees or agents charged with the installation of these Smart Meters received little to no training to install or properly inspect the Smart Meter component parts." (*Id.* ¶ 31). Defendants were "independent contractor[s] hired by FPL to install

Smart Meters," and "FPL label[led] each Defendant a 'participating independent contractor.' " (*Id.* ¶ 30 (alterations added)). Defendants' agency argument is unavailing as the Court accepts Plaintiffs' allegations regarding Defendants' independent contractor status as true. *See Dobbins v. Scriptfleet, Inc.*, No. 8:11–cv–1923–T–24–AEP, 2012 WL 2282560, at *2 (M.D.Fla. June 18, 2012).

Plaintiffs further argue their claims are not precluded by the FPL Tariff because they are not suing for failure or interruption of service or for fluctuation in voltage and because damages did not occur on the "Customer's side of the point of delivery." (Am. Compl. ¶ 39; *see* FPL Tariff § 2.7). These are factual questions for the trier of fact. *Cf. Potts v. Fla. Power & Light Co.*, 841 So.2d 671, 673 (Fla. 3d DCA 2003) (explaining no material issue of fact remained where the FPL Tariff expressly defined the customer's installation as "all wires, cutouts, switches and appliances and apparatus of every kind and nature used in connection with … an installation … ordinarily located on the Customer's side of Point of Delivery…." (alterations added; citation and internal quotation marks omitted)). On the basis of the well-pleaded allegations, the FPL Tariff does not bar Plaintiffs' negligence claims.

## B. Negligence

In Counts I and II, Plaintiffs claim Honeywell Building and Honeywell International negligently installed Smart Meters. Defendants challenge the viability of Plaintiffs' negligence claims on the basis the Amended Complaint does not contain sufficient factual allegations to infer˙ Defendants are liable for the misconduct alleged, and Plaintiffs fail to identify the standard of care Defendants owed, including precisely what Defendants should have

done to discharge their duty of care. (*See* Mot. 10–11).

 "To state a claim for negligence under Florida law, a plaintiff must allege that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach caused the plaintiff to suffer damages." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir.2001) (citation omitted). "Where a defendant's conduct creates a *foreseeable zone of risk*, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." *McCain v. Fla. Power Corp.*, 593 So.2d 500, 503 (Fla.1992) (emphasis in original; citations omitted). A duty to warn extends to those "dangers that are not open and obvious." *Belik v. Carlson Travel Grp.*, 864 F.Supp.2d. 1302, 1308 (S.D.Fla. 2011) (finding plaintiff stated a negligence claim where diving into water of an indeterminate depth was not an "open and obvious danger"). "[W]hether a duty of care exists is a question of law to be determined solely by the court." *Zarrella v. Pacific Life Ins. Co.*, 755 F.Supp.2d 1231, 1242 (S.D.Fla.2011) (alteration added; citation and internal quotation marks omitted).

 Foreseeability is also central to the question of proximate causation, a factual question "concerned with the specific, narrow factual details of the case, not with the broader zone of risk the defendant created." *McCain*, 593 So.2d at 503. Proximate cause is established where "prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Id.* "[I]t is immaterial that the defendant could not foresee the *precise* manner in which the injury occurred or its *exact* extent." *Id.* (altera-

tion added; emphasis in original; citation omitted).

 Defendants contend they were not subject to any specific duties of care, and that even if they were, Plaintiffs have not alleged precisely what Defendants "should have done" to properly discharge such duties. (*See* Mot. 11 (citing *Rinker v. Carnival Corp.*, 753 F.Supp.2d 1237, 1244 (S.D.Fla.2010))). But identifying the standard of care owed, as well as what Defendants should have done, is not required in order to supply "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a). Defendants' citation to *Rinker* does not support their proposition because in *Rinker* plaintiff's negligence claim was dismissed for failure to establish causation, not simply because plaintiff did not adequately plead the standard of care owed. *See* 753 F.Supp.2d at 1243.

Although Plaintiffs do not describe the precise nature of the duty or duties Defendants owed, the Court, drawing reasonable inferences in favor of the Plaintiffs, finds Plaintiffs have alleged Defendants had a duty to ensure their employees were properly trained and installed electrical meters correctly. Touching on the standard of care Defendants owed, Plaintiffs allege Defendants breached their duties "to install the Smart Meters in a competent, safe and reasonable manner" and "to warn of any risks associated with the improper installation" (Am. Compl. ¶ 55) by: (1) "[f]ailing to warn of any risks associated with the improper installation of the Smart Meters;" (2) "[f]ailing to hire or assign competently trained employees or agents capable of properly and safely installing the Smart Meters;" (3) "[f]ailing to inspect and test the 'Female' receptors and the Smart Meter 'Male' connectors for proper fit and that they were adequately safe for [ ] use;" (4) "[f]ailing to train [their] employees or

agents on proper and safe inspection, testing and installation of Smart Meters and removal of pre-existing matters;" (5) "[f]ailing to supervise [their] employees or agents to ascertain that they [we]re properly and safely installing the Smart Meters;" (6) "[f]ailing to inspect the work of [their] employees or agents to ensure that the Smart Meters were installed properly;" (7) "[f]ailing to remove the old meters in a manner which did not damage the 'Female' receptors in the meter can;" (8) "[f]ailing to install the Smart Meter in a safe and reasonable manner;" (9) "[f]ailing to follow the suggested enumerated procedures provided by FPL;" and (10) "[f]ailing to lubricate the 'male' prongs before inserting into the 'female' receptors to avoid damage as recommended by FPL." (*Id.* ¶ 56 (alterations added); *see also id.* ¶ 62).

Because the Smart Meters are electrical devices that connect to electrical wiring in a customer's home (*see* Am. Compl. ¶ 16), the improper and unsafe installation of Smart Meters creates "a generalized and foreseeable risk of harming others," specifically the home and its residents. *Lamm v. State St. Bank and Trust,* 749 F.3d 938, 947 (11th Cir.2014). This foreseeable zone of risk gives rise to a duty owed by Defendants. *See McCain,* 593 So.2d at 502. Accepting the allegation Defendants installed the Smart Meters without Plaintiffs' knowledge (*see* Am. Compl. ¶¶ 2, 4), the dangers of improper installation were not "open and obvious," *Belik,* 864 F.Supp.2d at 1308. Defendants breached their duty of care because they "failed to warn ... of the danger and potential loss that could result from the improper installation of the Smart Meter" and failed to properly "train staff to install the Smart Meters; supervise the installation of the Smart Meters; remove the old meter; and install the new Smart Meter." (Am. Compl. ¶ 45 (alteration added)). Plaintiffs

have sufficiently pleaded a duty of care owed and subsequently breached where Defendants entered Plaintiffs' properties without their knowledge and installed Smart Meters in an unsafe and improper manner.

■■■■ Defendants also challenge Plaintiffs' negligence claim on the basis of causation, contending Plaintiffs fail to explain "how any breach of duty caused Plaintiffs' damages." (Reply 5). Defendants assert Plaintiffs do not "tether" any of their allegations concerning the cause of the damage to "damages specifically claimed by Cortes and Knight." (Mot. 12). Defendants maintain it is impossible to infer whether their negligence plausibly caused Plaintiffs' injuries because "[t]here are myriad potential causes of damages from meters and meter enclosures, many of which occur in the customer's part of the enclosure." (*Id.* (alteration added)).

Plaintiffs, however, insist their injuries are "a direct and proximate result of the negligence" of Defendants because prior to the Smart Meter installations, Plaintiffs' meters were operational and not in need of repair (Am. Compl. ¶ 59; *see also id.* ¶ 65):

> Defendants' employees or agents would strike the old meter with extreme force to knock the meter loose. Then they would strike the Smart Meter with extreme force to install it in place of the old meter. What should take five to seven minutes was taking a mere 90 seconds, and, as a consequence, the "Female" receptors would bend and expand the [sic] during removal of the old meter and the "Female" receptors would crush during the installation of the new Smart Meter.

(*Id.* ¶ 36 (alteration added)). Electrical arcing in an improperly installed meter is not a freak injury, utterly unpredictable in light of common human experience. *See*

*McCain,* 593 So.2d at 503. Prudent human foresight allows one to anticipate possible electrical damage and arcing if meters are not properly installed and maintained. *See id.* Plaintiffs also allege "a licensed, professional electrician who serviced the Plaintiffs' properties made the determination that the Defendants' improper installations were ·the actual caus[e] of the Plaintiffs' respective harm[s]." (Resp. 23 (alterations added)). Plaintiffs sufficiently plead causation.

Accordingly, Plaintiffs have sufficiently stated claims of negligence.

### C. Gross Negligence

In Counts III and IV, Plaintiffs allege Defendants knowingly breached their duties to install Smart Meters properly and to warn of the dangers of improper installation, and were "grossly negligent[ ]" or "engag[ed] in a course of conduct such that the likelihood of injury to other persons or property was known by Defendant[s] to be imminent or clear and present." (Am. Compl. ¶ 69; *see id.* ¶ 75 (alterations added)). Defendants maintain Plaintiffs "mechanically add[ed] the gross negligent catchphrase[s]" and " 'buzz words' to an ordinary negligence claim," and thus have not sufficiently pleaded a claim for gross negligence. (Mot. 15 (alterations added) (citing *Ebeh v. St. Paul Travelers,* No. 8:09–CV–2628, 2010 WL 5553687, at *6 (M.D.Fla. Oct. 6, 2010))).

 To state a claim of gross negligence, Plaintiffs must allege: "(1) the existence of a composite of circumstances which, together, constitute an imminent or clear and present danger amounting to more than the normal and usual peril; (2) a showing of chargeable knowledge or awareness of the imminent danger; and (3) an act of omission occurring in a manner which evinces a conscious disregard of the consequences." *Deutsche Bank Nat'l*

*Trust Co. v. Foxx,* 971 F.Supp.2d 1106, 1117 (M.D.Fla.2013) (citation omitted); *see Kline v. Rubio,* ,652 So.2d 964, 965 (Fla. 3d DCA 1995). As to the third element, an employer may be liable for failure to properly train employees if the training (or lack of training) is conducted recklessly, intentionally, or with gross negligence. *Cf. City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (explaining the failure of a municipality in training its police force may be considered gross negligence). "[U]nder Florida law, an employer is liable in tort for reasonably foreseeable damages resulting from the negligent training of its employees and agents." *Jackson v. Montesino,* No. 08–80554–CIV, 2009 WL 1515511, at *9 (S.D.Fla. June 1, 2009) (alteration added; citation omitted).

 Defendants contend the Amended Complaint "contains no allegations of an imminent or clear and present danger" and no allegations of Defendants' "awareness of such a danger." (Mot. 12; *see* Reply 7–8). Plaintiffs have minimally pleaded Defendants were aware of the risks they took in installing the Smart Meters, and Defendants' improper installations were done "in a manner which evince[d] a conscious disregard of [the] consequences." (Am. Compl. ¶ 69 (alterations added); *see id.* ¶ 75). Honeywell Building was aware of the risks of improper installation and knew FPL designed training and protocols to reduce the risk to customers' properties, including properties owned by Plaintiffs and the Potential Class. (*See id.* ¶ 68). "Defendants' employees or agents charged with the installation of these Smart Meters received little to no training to install or properly inspect the Smart Meter component parts." (*Id.* ¶ 31). As discussed, Plaintiffs enumerate ten ways Defendants allegedly breached

the duties of care owed to Plaintiffs. (*See id.* ¶¶ 69, 75).

Plaintiffs have demonstrated a pattern of negligent training and improper and unsafe Smart Meter installations sufficient to satisfy the elements for gross negligence. *See Cariglia v. Se. Chrysler–Plymouth, Inc.,* 459 F.2d 994, 996 (5th Cir.1972) ("In doubtful cases, the question of whether such negligence is ordinary or gross is, as we have heretofore held, one which under appropriate instructions should be submitted to the jury." (emphasis omitted) (quoting *Carraway v. Revell,* 116 So.2d 16, 22 (Fla.1959))).

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Motion [ECF No. 28] is **DENIED.**